**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

**DISTRICT OF COLUMBIA**
c/o Mayor Muriel Bowser
1350 Pennsylvania Ave. NW
Washington, DC 20004

c/o Attorney General Brian Schwalb
400 6th St. NW
Washington, DC 20001

*Plaintiff-in-Interpleader,*

v.

**INNERCITY COLLABORATIVE COMMUNITY DEVELOPMENT CORPORATION**
5219 Call Place SE
Washington, DC 20019

*and*

**PEARL ALPHA FUNDING, LLC d/b/a PEARL CAPITAL**
55 Almeria Avenue
2nd Floor
Coral Gables, FL 33134

*and*

**INTERNAL REVENUE SERVICE**
1111 Constitution Avenue, NW
Washington, DC 20224

*Claimant-Defendants.*

Civil Action No. 1:26-cv-4153

# COMPLAINT FOR INTERPLEADER AND DECLARATORY RELIEF

Plaintiff-in-Interpleader, the District of Columbia ("District"), brings this complaint for interpleader under 28 U.S.C. § 1335 to determine the interests of Claimant-Defendants Innercity Collaborative Community Development Corporation ("ICCDC"), Pearl Alpha Funding, LLC

("Pearl Alpha Funding" or "Pearl Capital"), and the Internal Revenue Service ("IRS") (together "Claimant-Defendants"). The dispute centers around the proceeds of invoice number MAR2026CMIICCDC in the amount of $14,926.36 pursuant to Grant Number 2026-CMI-06, which was awarded to ICCDC by the District Department of Youth Rehabilitation Services ("DYRS"). Claimant-Defendants' competing claims to the disputed invoice has created uncertainty and interfered with the District's ability to discharge its obligations to the rightful owner of the proceeds. The District seeks an order resolving Claimants' ownership claims to the proceeds, determining how the funds should be dispersed, and dispersing the funds.

## PARTIES AND PROPERTY

1. Plaintiff-in-Interpleader, the District, is a municipal corporation organized under the laws of the United States and the District of Columbia. *See* Pub. L. 93-198, 87 Stat. 774 (1973); D.C. CODE § 1-102.

2. DYRS is an agency within the executive branch of the District. D.C. CODE § 2-1515.02(a).

3. Defendant-Claimant ICCDC is a nonprofit corporation registered in the District of Columbia, with its principal address as 5219 Call Place SE, Washington, DC 20019.

4. Defendant-Claimant Pearl Capital is a limited liability corporation registered in Delaware, with its principal address at 55 Almeria Ave., 2nd Floor, Coral Gables, FL 33134.

5. Defendant-Claimant IRS is an agency of the federal government headquartered in the District of Columbia, with its address at 1111 Constitution Avenue, NW Washington, D.C. 20224

6. DYRS awarded Grant No. 2026-CMI-06 (or "DYRS Grant") to ICCDC. Exhibit 1.

7. ICCDC submitted Invoice Number MAR2026CMIICCDC, dated April 2, 2026,

("Invoice"), in the total amount of $14,926.36, for services provided under the DYRS Grant. Exhibit 2.

## JURISDICTION

8. Plaintiff-in-Interpleader brings this interpleader action under 28 U.S.C. § 1335.

9. The property in controversy exceeds the jurisdictional threshold and minimal diversity exists among the Claimants.

10. Venue is proper under 28 U.S.C. § 1391(b)(2) because the property in controversy is located within the bounds of this judicial district in the funds held by the government of the District of Columbia. Additionally, the grant that the invoice is associated with is located in the District of Columbia and involve the obligations of the government of the District of Columbia.

11. Claimants have made adverse claims to the disputed invoice, which is located within the District of Columbia, and are thus subject to this Court's jurisdiction.

## STATEMENT OF INTERPLEADER ACTION

12. On November 19, 2025, CT Corporation filed and recorded a UCC Financing Statement with the Washington D.C. Recorder of Deeds. Exhibit 3, UCC Notice, at 4–7.

13. CT Corporation System is an agent of Defendant-Claimant Pearl Capital and filed the UCC Financing Statement on its behalf. Exhibit 3, UCC Notice, at 2.

14. The UCC Financing Statement secured the "[m]erchant's now owned and hereafter acquired accounts and payment intangibles, and their respective proceeds, as those terms are defined in the Uniform Commercial Code." Exhibit 3, UCC Notice, at 4.

15. By letter dated March 30, 2026,[1] the District received a UCC notice from Pearl Capital

[1] The District received a different letter from Pearl Capital on December 15, 2025; the same UCC notice was attached to both letters. For the purposes of this complaint, the District will only refer to the March 30, 2026 letter.

titled "UCC LIEN NOTICE AND NOTICE OF GUARANTY OF PERFORMANCE GRANTED BY MERCHANT TO SECURED CREDITOR Pearl Alpha Funding, LLC GIVING Pearl Alpha Funding, LLC PERFECTED SECURITY INTEREST OVER ACCOUNT RECEIVABLES OF MERCHANT" (hereinafter "UCC Notice").

16. In the UCC Notice, Pearl Capital notified the District that, due to ICCDC's breach of its agreement with Pearl Capital, Pearl Capital was entitled to ICCDC's future accounts. Exhibit 3, UCC Notice at 2.

17. The UCC Notice advised the District that "[p]ursuant to UCC sections 9-406 and 9-607, you are hereby advised not to disburse any funds to the Merchant after the date hereof – doing so will not discharge your obligation to the Secured party and may well subject you to multiple liability for amount equal to that which has been paid to Merchant." Exhibit 3, UCC Notice at 2 (emphasis omitted).

18. There is one remaining invoice for work performed under the Grant, dated April 2, 2026, which the District has not yet paid. The District does not dispute that the funds are owed for work performed. Exhibit 2, Invoice at 1.

19. The Invoice shows a current total invoice of $14,926.36. Exhibit 2, Invoice at 1.

20. On May 27, 2026, the IRS signed a Notice of Federal Tax Lien ("NFTL") against ICCDC for the total amount of $46,254.16. Exhibit 4, NFTL.

21. On June 9, 2026, the IRS filed and recorded its NFTL with the Official Records of Washington, DC. Exhibit 4, NFTL.

22. The IRS subsequently sent a Notice of Levy to the District dated July 20, 2026, with a total amount due listed as $44,969.56. Exhibit 5, Notice of Levy at 2.

23. To date, none of the disputed total of $14,926.36 has been remitted to any of the

Claimant-Defendants.

24. To date, the Claimant-Defendants have not reached agreement as to the District's remittance of funds of the Invoice.

25. At this time, the District cannot distribute the funds to any one Claimant-Defendant without exposing itself to claims from other Claimant-Defendants.

26. The District is preparing a motion pursuant to 28 U.S.C. § 1335 to deposit into the registry of this Court the entire amount of the disputed invoice.

## RELIEF REQUESTED

The District requests that the Court:

A. Determine, between Claimant-Defendants, the proper recipient of the funds payable pursuant to the Invoice;

B. Enjoin Claimant-Defendants from instituting any action against the District for recovery of funds pursuant to the Invoice;

C. Discharge the District from responsibility for administration of the Invoice upon court judgment; and

D. Grant such other relief as this Court deems just and proper.

Dated: November 23, 2026

Respectfully submitted,

BRIAN L. SCHWALB
Attorney General for the District of Columbia

CHARLES J. COUGHLIN
Deputy Attorney General, Commercial Division

VIRGINIA CARLINER
Assistant Chief, Government Contracts Section

*/s/ Alyson Brusie*
ALYSON BRUSIE [#90040138]
Assistant Attorney General
400 6th Street, N.W.
Washington, DC 20001
(phone) 202.890.9311
alyson.brusie@dc.gov

*Counsel for Plaintiff-in-Interpleader District of Columbia*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

**DISTRICT OF COLUMBIA**
c/o Mayor Muriel Bowser
1350 Pennsylvania Ave. NW
Washington, DC 20004

c/o Attorney General Brian Schwalb
400 6th St. NW
Washington, DC 20001

*Plaintiff-in-Interpleader*,

v.

**INNERCITY COLLABORATIVE COMMUNITY DEVELOPMENT CORPORATION**
5219 Call Place SE
Washington, DC 20019

*and*

**PEARL ALPHA FUNDING, LLC d/b/a PEARL CAPITAL**
55 Almeria Avenue
2nd Floor
Coral Gables, FL 33134

*and*

**INTERNAL REVENUE SERVICE**
1111 Constitution Avenue, NW
Washington, DC 20224

*Claimant-Defendants.*

Civil Action No. 1:26-cv-4153

**EXHIBIT 1**

**DYRS Grant No. 2026-CMI-06**

**OVERNMENT OF THE DISTRICT OF COLUMBIA**
Department of Youth Rehabilitation Services

**District of Columbia**
**Department of Youth Rehabilitation Services**

**Grant Award Notice**

| | |
|---|---|
| **Grantee:** | Innercity Collaborative Community Development Corporation |
| **Grant Number:** | 2026-CMI-06 |
| **Grant Name:** | Credible Messenger Program Initiative |
| **Grant Amount:** | $675,000 |
| **Grant period:** | October 1, 2025 – September 30, 2026 |
| **Funding Source:** | Local Funds |

**Allocation:** Total Funding Amount [$675,000.00]

A. **Incorporation by reference:** Grantee agrees to carry out the conditions stated and incorporated in the original RFA incorporated by reference into this Grant Award.
B. **Activities which the grant funds:** See "Attachment 1: Activities Funded," which is incorporated by reference. *Important note:* This grant is subject to the District of Columbia's Anti-Deficiency Act, D.C. Official Code §§ 47-355.01 - 355.08.
C. **Limitations on changes:** Only the Director of the Department of Youth Rehabilitation Services or a designee is authorized to alter the terms and conditions of this grant pursuant to a properly executed modification made pursuant to DYRS procedures.
D. **DYRS Grant Administrator:** DYRS Grant Administrator: Daniela Farinas, Supervisory Grants Management Specialist 450 H Street, NW, Washington, D.C., 20001

---

**Grantee's contact information:**
Innercity Collaborative Community
5219 Call Place SE
Washington DC, 20019

**Rev. Judie Shepherd**
Executive Director,
[redacted]

**Signatures**
Sam Abed, DYRS Director
SIGNATURE: [signature]
DATE: 10/1/2025

**Signatures**
Rev. Judie Shepherd-Gore, Executive Director
SIGNATURE: Rev. Judie S. McGore
DATE: 10/1/2025

# DYRS Grant Award & General Terms and Conditions

## Grant Award Notice

**Grantee:** Innercity Collaborative Community Development Corporation
**Grant Number:** FY2026-CMI-06
**Grant Name:** FY26 Credible Messenger Program Initiative
**Grant Amount:** $675,000
**Grant period:** October 1, 2025- September 30, 2026
**Funding Source:** Local Funds
**Grant Type:** Cost Reimbursable

**Allocation:** Total Funding Amount [$675,000]

Incorporation by reference: Grantee agrees to carry out the conditions stated and incorporated in the original RFA by reference into this Grant Award.

- Activities which the grant funds: See "Attachment 1: SOW and "Activities Funded," which is incorporated by reference. Important note: This grant is subject to the District of Columbia's Anti-Deficiency Act, D.C. Official Code §§ 47-355.01 - 355.08.
- General Terms and Conditions: See "Attachment 2: General Terms and Conditions," which is incorporated by reference.
- Limitations on changes: Only the Director of the Department of Youth Rehabilitation Services or a designee is authorized to alter the terms and conditions of this grant pursuant to a properly executed modification made pursuant to DYRS procedures.

**DYRS Grant Administrator:** Daniela Farinas
**DYRS Compliance Monitor**: Sebastian Carrillo
**DYRS Technical Monitor**: Norman Brown

**Grantee's contact information**:
Name: Rev. Judie Shepherd-Gore
Email: [redacted]
Address: 5219 Call Place SE, Washington DC 20019
Phone: [redacted]

# Attachment 1: Scope of Work & Activities Funded Document

## Purpose

The grantee ICC will provide community based, positive youth programming to committed, post-committed and community youth of the Department of Youth Rehabilitation Services located at its Achievement Centers, the provider location and out in the community. The grantee will report to the grantor (DYRS) on all activities outlined in this document.

### A. Target Population

This grant program directly provides services to youth and their families referred by DYRS in Wards (Wards 1-8)).

### B. Component Details

All components included in the original RFA remain active under continuation. Credible Messengers are required to address all program components including but not limited to transformative mentoring; group and one on one mentoring; family engagement.

### C. Background Checks:

All selected grantees and staff members are required to complete a background clearance process prior to continuation in order to work with DYRS youth and families. The background clearance process is administered by Checkr and monitored by the Community Programming Initiative Team (CPI). Details on the clearance process are outlined in the Standard Operating Procedures for the Credible Messenger Initiative, but generally, the clearance screenings include: Child Protection Registry Clearance, DC Criminal Background Check Clearance, Drug Screen Clearance, FBI Criminal Background Clearance, and National Sex Offender Registry Clearance.

## Project Outcomes

### A. Outcome

The overall outcome for this grant program is in alignment with the DYRS mission – to improve public safety and give court-involved youth the opportunity to become more productive citizens by building on the strengths of youth and their families in the least restrictive, most homelike environment, consistent with public safety. The main outcomes are centered around increasing protective factors and decreasing risk factors for youth.

### B. Outputs

- Conduct structed group sessions and provide at least 20 youth with at least 52 individual (one- on- one) mentoring sessions per year.
- 100% of youth served increased access to productive assets including but not limited to career networking, workforce development, entrepreneurship support, community service activity, or education.
- Coordinate, facilitate, and execute at least 1 youth engagement activity per month and 1 Family engagement activity per month
- Participate in monthly (1x) family support reviews.

## Deliverables

| Deliverables | Description | Submit to | Due Dates |
|---|---|---|---|
| **Staff Background Checks** | Grantees and staff members are required to submit employee names for clearance to work with DYRS youth and families. The clearance screenings include: Child Protection Registry Clearance, DC Criminal Background Check Clearance, Drug Screen Clearance, FBI Criminal Background Clearance, and National Sex Offender Registry Clearance. | DYRS leads and shares results | October 1 (Completed 2x per year; every 6months) Must be completed before Oct 1st. Possibly, last Friday of Sept. |
| **Group/Activity Sign in Sheets** | Group and Activity sign in sheets. | Credible Messenger Leadership and CC Grants Compliance Monitor. | Due by 12pm every Friday. |
| **Weekly FamCare Notes** | Effective Documentation of all engagements/interactions regarding the assigned youth/family. | FamCare | Due w/in 48hrs. of the engagement. |
| **Monthly Lesson Plans** | Lesson Plans serve as the blueprint to the weekly mentoring groups as well as activities that are decided upon for the week/month for the youth. Its lessons are based on the seven pillars that represent the essential foundation for developing a sense of self-worth. This curriculum is the basis for the group-mentoring sessions facilitated by the Credible Messengers, and the learnings from these sessions are meant to translate into youths' everyday lives. | Credible Messenger Leadership and CC Grants Compliance Monitor. | Monthly-Due the 1st Friday of the month. |
| **Monthly Family Engagement Form** | A monthly form which governs the FEM's work with their assigned families. The form depicts the family's strengths/challenges; desired outcomes/goals; progress/barriers and overall synopsis of the family's success/barriers to goal attainment every 30days. The CM-Family Engagement Specialists reviews all of the submitted updates each month in an effort to provide valuable feedback to the FEM's during their monthly review call. | Credible Messenger Leadership and CC Grants Compliance Monitor. | 25th of each month or the next business day if the 25th falls on a weekend/holiday |
| **Monthly activities calendar** | A detailed monthly calendar detailing planned activities. Should include activity description, time, location and purpose. Must reflect at least 1 youth activity and 1 family engagement activity. | Credible Messenger Leadership and CC Grants Compliance Monitor. | 1st of the month |
| **Monthly Staffing/Mentoring Assignment List (MS/MA)** | Doc entails the current staffing and a list of all current youth/families assigned. This includes contact info such as addresses, youth's | Credible Messenger Leadership and CC Grants Compliance Monitor | 5th of each month. If the 5th falls on a weekend and/or holiday, due the |

| | | | |
|---|---|---|---|
| | placement; contact number, assigned CC; Dob, age. It also reflects the number of youth/families assigned to each CM/FEM. | | following business day |
| **Monthly Supervision Form** | Document which reflects the mentors strengths/challenges, to include steps that the PC (supervisor) will take to assist the staff with growth. The document also depicts an overview of the mentors caseload, which includes the youth/families successes and challenges as well as support that's needed to further address the youth/families. | Do not submit. Keep on file for audit. | Monthly |
| **Monthly Invoice/Reconciliation Report** | Monthly invoice with all support documentation in accordance with DYRS financial checklist and financial policy | Management Analyst- Financial and CC Grants Compliance Monitor and Credible Messenger Leadership | Due the 10th |
| **Quarterly Programmatic Report** | Please use DYRS template to submit a written report to include:<br>**1.**Activities completed in the quarter (planned vs executed)<br>**2.**Achievements and Challenges (major accomplishments and challenges encountered/lessons learned)<br>**3**.Progress toward outputs and outcomes (progress to targets)<br>**4.**Deliverable Completion<br>**5.**Financial outlook.<br>**6**.Outcomes Report | Credible Messenger Leadership and CC Grants Compliance Monitor | Due the last day of each quarter. |
| **Bi-annual Checkr Check** | DYRS will conduct a bi-annual background check on all current/ newly proposed staff under the grant award | N/A DYRS Leads and shared results | March 30, 2026 |
| **Final Report** | Please use DYRS template to submit a written report to include:<br>**1**.Activities completed in the year (planned vs executed)<br>**2.**Achievements and Challenges (major accomplishments and challenges encountered/lessons learned)<br>**3**.Final achievement toward outputs and outcomes (progress to targets)<br>**4.**Financial Expense Report (summary of expended cost categories) | Credible Messenger Leadership and CC Grants Compliance Monitor. | September 15, 2026 |

## Activities

### A. Activity #1- Attend Provider Onboarding.

- Participate in an inaugural grant award meeting and subsequent trainings to discuss grant objectives, approved budget, program outcomes, grantor expectations and Standard Operating Procedures.

### B. Activity #2- Attend and Participate in Meetings and Trainings.

- Attend all meetings and trainings as scheduled.

### C. Activity #3- Attend Team Decision Making Meetings

- Attend TDM meetings every 90 days led by Care Coordination and help incorporate youth and family voice into success plan development and adaptation.

### D. Activity #4- Ensure staff receive and maintain all clearances throughout FY.

- Communicate with DYRS appointed staff as needed to ensure all staff are fully cleared at all times.
- Maintain files and storage for all clearance documentation.

### E. Activity #5- Required documentation submission.

- The Credible Messenger will collaborate with DYRS to ensure that all necessary information pertaining to youth's identified goals listed in ISP (Individual Success Plan), is properly documented and submitted into FamCare in a timely manner.
- Credible Messengers are required to adhere to the detailed protocols for appropriately providing services to participants and/or families, tracking interactions, documenting activities within FamCare & SharePoint, reporting outcomes, submitting timely and accurate invoicing, attending mandatory meetings and trainings, etc.
- Routine documentation submission will be provided to DYRS by the identified time frames highlighted within the Credible Messenger's SOP Manual and CMI RFA i.e. unusual incident reports, group sheets, monthly outcome reports, invoices, quarterly report, etc.

### F. Activity #7- Participate in monthly and/or quarterly site audits

- Site visits enable DYRS to observe service delivery of Credible Messenger Service Provider. Site visits are a key component of an overall strategy to ensure quality of services that deliver positive outcomes for participants and are a summary of contract monitoring measures that occur throughout the fiscal year.

### G. Activity #8- Attend close out meeting with Grantor.

- Near the end of the fiscal year, providers will receive notification of whether they will continue into the next fiscal year, if their grant will end, or if there will be another grant competition for them to apply.

### H. Activity #9- Facilitate youth survey

- Facilitate a baseline and endline survey for youth served on the Credible Messenger program. You are free to use any mechanism you see fit (virtual, family orientation, at introduction, TDM, or group).

## Attachment 2: General Terms and Conditions

### A. Terms & Conditions

Each entity applying for the grant (Applicant) advertised in the Request for Applications (RFA), the successful Applicant (Grantee), and a subrecipient of funds under the grant provided in response to an application under the RFA (the Grant) is subject to and must comply with the following:

- The applicable general terms and conditions outlined in this Appendix 1 – DYRS Grant General Terms and Conditions (GT&C);
- The promises, certifications, assertions, and assurances made as part of the application in Appendix 2 – DYRS Grant Promises, Certifications, Assertions and Assurances (PCA); and
- The terms, conditions, or restrictions in the Grant award documents.
- The Grantee must review the Grant award document for additional administrative and programmatic requirements.

### B. Order of precedence

In the event of inconsistency among the provisions of the DYRS grant documents governing the Grant, the inconsistency shall be resolved by giving precedence to the following documents, including their attachments, in the following order:

- The most recent written, DYRS-approved amendment to the Grant Award Notice (GAN);
- The GAN;
- The DYRS Request for Applications (RFA), including all appendices; and
- The Grantee's submitted proposal.

### C. Communications with DYRS

- Communications shall be directed to DYRS staff, as the RFA or Grant states.
- Reports and other submissions shall be directed to compliance and technical monitor.
- If reports are electronically filed, required signatures will be clearly reproduced.
- The Grantee shall maintain electronic mail ("e-mail") capabilities for communication with DYRS.

A notice shall be deemed timely delivered to DYRS only when written confirmation of receipt is provided by DYRS.

## 1. Grant match: projection and documentation

### A. When documentation of a grant match is required:

- In support of an application, the applicant must provide a basic budget that shows unit rates and quantities, as with hours worked, square feet used, or miles driven; and
- In support of an award, the Grantee must provide the following, which must be acceptable to DYRS, unless DYRS revises or waives the requirement in writing:
    - Documentation for salary and items purchased in the same form as required in the Payment section of this document.
    - Documentation of a proposed in-kind match, including detail for volunteers. Volunteer hours provided to the Grantee by individuals will be valued at rates consistent with those ordinarily paid for similar work in the Grantee organization. If the Grantee does not have employees performing similar work, the rates will be consistent with those ordinarily paid by other employers for similar work in the same labor market. Donated space, as for a meeting or event, may be valued

according to a written statement from a property's owner or manager. Donated vehicle use may be valued as provided for reimbursement of travel.

### B. Communication of a material change

The Applicant and the Grantee shall advise DYRS immediately orally and thereafter immediately in writing, if:

- A material condition of the Application or performance of the grant has changed. A material condition includes: the loss of a staff member proposed as a principal; the lack of funds to pay bills incurred for the grant's activities; the expenditure of granted funds for non-granted activities, materials, or supplies; or a change in the Applicant's governance; or

The Grantee's insurance coverage has been reduced, or the Grantee has been notified of a cancellation in whole or in part of its insurance.

## C. Compliance as a continuing condition of eligibility

The Applicant must continue to comply with these terms during the Grant period, if awarded a grant. If, as the Grantee, the Applicant fails to comply with the terms and conditions of this award, DYRS may suspend, terminate, take other corrective action (including, but not limited to, recovery of funds provided under the Grant), or initiate dispute resolution.

### A. Grant award contingent on available funding

The Grant award and DYRS's distribution of funds pursuant to the Grant award are subject to the availability of funding from the sources identified in the RFA for the particular grant opportunity or project. DYRS's ability to provide funds is, and shall remain subject to, the provisions of:

- The Federal Anti-Deficiency Act, 31 U.S.C. §§ 1341, 1342, 1349, 1351;
- The District Anti-Deficiency Act, D.C. Official Code § 47- 355.01- 355.08; and
- Amendments to these statutes.

### B. Bonding Requirements

A bond is not required of the Grantee unless DYRS states the requirement in writing.
If DYRS does require a bond, the Grantee, before accepting the grant, must secure the bond in an amount not less than the total amount of the funds awarded, against losses of money and other property:

- Caused by fraudulent or dishonest act, and

Committed by an employee, board member, officer, partner, shareholder, trainee, or volunteer.

## C. Grant period

The period of this Grant shall begin on the date given on a GAN. On and after the begin date, the RFA, the documents it incorporates, and the documents specified in Section 1 of this document apply to the Applicant as "Grantee."

The period of the Grant shall end on the date stated in the GAN, unless DYRS modifies the period in writing ("end date").

## A. Payment

The Grantee will be reimbursed for work performed and expenses incurred.

- DYRS will not reimburse the Grantee for grant-related expenditures made before the

begin date, unless approved by DYRS in advance.

- The sum of all monies paid to the Grantee pursuant to the grant award shall not exceed the total amount stated for the Grant.
- Notwithstanding the above, DYRS may withhold payment if DYRS determines that the Grantee has failed to comply with terms of the Grant.
- The Grantee may submit invoices for grant-related reimbursement when it chooses, but not later than September 30 for expenses incurred in the prior 365 days
- The Grantee must use the DC Vendor Portal at www.vendorportal.dc.gov to submit invoices. To register for use of the portal, the Grantee must have a business license issued by the District Department of Consumer and Regulatory affairs. The Grantee must inform the agency's point of contact any objections or limitations with the use of the portal prior to acceptance of the grant.
- The Grantee's submittal must include a signed invoice, on organization letterhead, with federal tax identification number and supporting documentation. The submittal to DYRS must include:
    - Summary Invoice (current expenses, prior invoiced, cumulative expenses, approved budget, available budget, and budget % spent);
    - Each expense must have the required support documentation as detailed in the DYRS finance checklist (to be provided at orientation kick off)
    - DYRS requires that for any cost to be reimbursed, the cost must be documented to be **reasonable, allocable, and allowable**. DYRS applies federal cost principles to determine whether costs are reimbursable and to what extent charged to a DYRS grant, regardless of the source of funds for the grant (i.e., federal cost principles apply even if the DYRS grant is funded entirely with District funds)

## B. Conduct & Certifications

### A. Unethical conduct

The Applicant/Grantee shall avoid unethical conduct with respect to securing and administering granted funds, with ethical conduct to be measured generally against the provisions of the District Ethics Manual (most recent edition as of the time the grant is awarded), found at www.bega.dc.gov, under the heading for documents.

**<u>In particular, the Grantee shall avoid:</u>**

- Apparent and actual conflicts of interest;
- Contributing to a violation of the District's restrictions on gifts to District personnel; and
- Contributing to a violation of the two-year ban on District personnel taking certain actions regarding a "particular matter" described in the District Ethics Manual.
- No Applicant/Grantee shall employ or retain a person or selling agency to solicit or secure the Grant, a payment under it, or an amendment, upon an agreement or understanding for a commission, percentage, brokerage, or contingent fee. Except, an applicant or grantee may condition its compensation for a bona fide employee on grant-related job performance and may retain an attorney for compensation permitted by the District's Rules of Professional Conduct.
- Except as may be allowed under the District Ethics Manual for items that are unsolicited and of nominal value, with respect to grant funds, the Grantee and Grantee's employees, officers, or agents shall not solicit or accept a gift, gratuity, favor, or anything of monetary value, from: a contractor, subcontractor, vendor, party to a related

agreement, or a beneficiary of the Grant.

- If the Grantee is has a conflict of interest, he or she shall not participate in the selection, award, or administration of funds from the Grant if that would create a real or apparent conflict of interest. This prohibition also applies to a Grantee's employee, officer, or agent. An example of a conflict would be when the Grantee decides to employ, or buy from, a person or entity in which he or she, or a member of his or her immediate family, including a domestic partner, has an employment or financial interest.

## B. Safe Work Environment

The Grantee, and its contractors, subcontractors, or subgrantees, shall provide a safe work environment for work on DYRS-funded projects. The Grantee shall provide a procedure for reporting unsafe working conditions and addressing reports made. If the Grantee, contractor, subcontractor, or subgrantee receives an allegation of an unsafe working condition or practice or has a safety incident, the pertinent party shall investigate the reported unsafe condition or practice and take appropriate action to address the situation in a timely manner. The incident and response shall be described in the Grantee’s next grant report.

## C. Do No Harm

Do no harm is a concept that helps organizations analyze the potential interactions between their interventions and the context in which they are operating, particularly in situations of conflict or fragility. It requires a deep understanding of conflict sensitivity and recognizes that support whether peacebuilding or violence prevention or even just aid has the potential to support either conflict or peace. When an intervention of any kind enters a context, it becomes part of that context; all contexts are characterized by dividers and connectors; all interventions will interact with both dividers and connecters, making them better or worse; interventions interact with dividers and connectors through their organizational actions and the behavior of staff; the details of an intervention are the source of its impact; there are always options. Every organization should understand its context to ensure no harm to the populations served.

## D. Unusual Incident Reporting

The Grantee shall report each unusual incident involving or affecting performance of the Grant to the Grant Administrator within twenty-four (24) hours of the incident or of the Grantee’s learning of the incident. The initial report may be oral or in writing (typically by e-mail). The Grantee shall, within five (5) days of the incident, communicate in writing to the Grant Administrator a full description of the incident and any response(s) taken or to be taken in response to the incident.

An unusual incident is an event or occurrence significantly different from routine or established procedure that affects or may affect performance of the grant. Examples include, but are not limited to, an injury, a traffic accident, a theft, or the firing or resignation of a principal staff member or contractor identified in the Application.

## E. Ensuring Confidentiality

Maintaining the confidentiality of youths’ personal information is an important part of the rehabilitative process for court-involved youth through which we can safeguard their future educational and employment prospects, encourage accountability, and prevent the public stigmatization of young people for “youthful transgressions.”

Sharing the personal information of a young person committed to DYRS is illegal under DC law. Except for in limited circumstances as outlined by statute, and with proper approvals up to and including a court order, it is illegal to disclose any information about an individual's involvement with the juvenile justice system. DC Code §16-2336 specifically provides that:

*Whoever willfully discloses, receives, makes use of, or knowingly permits the use of information concerning a child or other person in violation of sections 16-2331 through 16-2335, shall be guilty of a misdemeanor and, upon conviction thereof, shall be fined not more than $250 or imprisoned not more than ninety days, or both. Violations of this section shall be prosecuted by the Attorney General in the name of the District of Columbia.*

*General: No Disclosure of Confidential Information Unless Authorized by This Policy*

Case records, social records and law enforcement records pertaining to youth are confidential. Unless authorized as provided in this policy, DYRS staff, contractors, subcontractors (which include the GRANTEE and Service Coalition provider staff) and volunteers shall not disclose such records to any person or agency.

Confirmation of confidential information that is in the possession of another person is a disclosure. Consequently, unless authorized as provided in this policy, DYRS staff, contractors, subcontractors (which include the GRANTEE and Service Coalition provider staff), and volunteers shall not confirm any confidential information in youth case records, social records, or law enforcement records to any person or agency. Disclosure of identity or status of a youth as a DYRS youth is also unlawful.

*Authorized Disclosures: Exceptions to General Rule of Non-Disclosure*

Community Programming Initiative Grantees' Standard Operating Procedures, effective October 27, 2022, District of Columbia and federal law provide for authorized disclosure of confidential information to specific persons and agencies. In order to comply with applicable laws, DRYS staff, contractors, subcontractors (which include the Grantee and Service Coalition provider staffs) and volunteers shall respond to requests for confidential information by performing the following actions:

- Requests from the following shall be directed to the DYRS Program Manager for CPI:
  - A youth's attorney, an attorney for a youth's parent or guardian
  - Personnel of the Family Court Social Services Division (CSS), the Court Services and Offender Supervision Agency (CSOSA), the Pretrial Services Agency (PSA), or DYRS. These requests shall be directed to the DYRS Program Manager for CPI.
  - Requests from the Press shall be directed to the DYRS Program Manager, who will consult with the General Counsel to determine what information, if any, may be disclosed.

*Audit Trail for All Disclosures of Confidential Information*

The Grantee will ensure contractors, and subcontractors (which include the GRANTEE and Service Coalition provider staffs) shall maintain an audit trail for all disclosures of confidential youth information. The audit trail shall include:

- Service Coalition Providers, contractors, or subcontractors (which include the Grantee and Service Coalition provider staffs) disclosing the confidential information Name of the person inspecting or receiving the confidential youth information
  - Type of information disclosed

  - Date of the disclosure

Grantees will read and sign the confidentiality agreement. Likewise, the Grantee will ensure Service Coalition providers employees and volunteers that work with DYRS youth read, review, and sign the DYRS/Grantee Confidentiality Agreement. The Confidentiality Agreement informs staff and volunteers that they are not to disclose personal, confidential information about DYRS youth to anyone, except for other authorized employees, who have also signed this confidentiality agreement, as well as DYRS staff as necessary. Copies of signed confidentiality agreements from Service Coalition Providers should be retained by the Grantee in the files of the individual Service Coalition providers.

### F. Sexual Harassment Policy:

Contractors and grantees carrying out work on behalf of the District government shall not sexually harass colleagues who carry out work on behalf of the District government; District government employees; or customers, clients, or beneficiaries of the services the contractors and grantees provide on behalf of the District government. Clients, customers, beneficiaries, employees, and colleagues may file complaints that trigger sexual harassment investigations and possible remedies, including requiring the contractor or grantee to use alternate personnel to provide services, and other remedies available under the contract or grant agreements including termination of the contract or grant.

In addition, sexual harassment by District government employees, clients, customers, or visitors against District government employees, contractors, or grantees, or other clients, customers, or visitors, at District government worksites or service sites, is prohibited and complaints made against District government employees who sexually harass contractors, grantees, agency clients, customers, or visitors, upon investigation, may result in discipline of the employee and accommodations for the contractor, grantee, customer, or visitor, such as having another government official assigned to the matter.

All District government contractors and grantees must affirm that they will abide by the D.C. Human Rights Act including its prohibitions on sexual harassment, consistent with 4 DCMR § 1100 et seq. For procurements handled by the Office of Contracting and Procurement, such affirmation will be required in the Bidder/Offeror Certification form. Contractors and grantees are also required to obtain such affirmations from their employees and subcontractors working on District government contracts. Please ensure that you review Mayor's Order 2023-131 in its entirety and comply with its requirements in carrying out work on behalf of the District government

## G. Grant purchases, including equipment, exceeding $500 per unit cost

- The Grantee shall not purchase with grant funds equipment or supplies exceeding $500 per unit cost ("Big Grant Purchase") without DYRS's written agreement.
- For each Big Grant Purchase, the Grantee shall give advance written notice to DYRS to allow DYRS to approve or disallow the purchase.
- Identification of a Big Grant Purchase in a DYRS-approved proposal constitutes approval of the Big Grant Purchase. If a Big Grant Purchase is not identified in a DYRS-approved proposal, advance notice shall be given four (4) weeks in advance of the commitment to purchase. DYRS may waive this time period in writing, for good cause.

- For all Big Grant Purchases, the Grantee shall maintain an inventory record ("Big Grant Purchase Inventory") showing:
  - Purchase price;
  - Grant number;
  - Name of item
  - Manufacturer's name;
  - Serial number (if applicable);
  - Acquisition history (purchase order, invoice, packing slip);
  - Guarantee or warranty lapse date;
  - Storage location;
  - Unit price; and
  - Additional costs, if any, for transportation, installation, and taxes, each as a separate item.
- The Big Grant Purchase Inventory shall be updated annually, or at the grant end date, whichever occurs first.
- DYRS may inspect and reclaim all or part of the inventoried equipment within 12 weeks of the grant end date.
- Warranties for Big Grant Purchases are governed by the provisions for purchases of materials and labor with an aggregate value of over $500 as set forth in the Contracts, subcontracts, or subgrants section of this document

## H. Modifications of the grant, including extensions and increases

The terms and conditions of the grant may be modified only upon DYRS's prior written approval. The modification shall take the form of an amendment to the GAN. Through an amendment, DYRS may increase or reduce the grant amount, change scope, and/or extend or reduce the grant period.

If DYRS notifies the Grantee that a funding increase or an extension of the grant period is available, the Grantee must apply for the increase or extension in writing according to the terms of the DYRS notification. Typically, DYRS requires an application to extend a grant period eight (8) weeks in advance of the grant's then-current end date. The application must justify the amendment, and include a description of proposed changes to scope, performance schedule, description of proposed outcomes, and budget.

## I. Contracts, subcontracts, or subgrants

- Nothing in the GAN shall be construed to create a contractual relationship between DYRS and Grantee's contractor, subcontractor, subgrantee, or vendor.
- Any Grant-related work and/or activity that is contracted, subcontracted, or subgranted is subject to applicable District law and DYRS's review and approval. The Grantee shall give DYRS advance notice of contracts, subcontracts, and subgrants enough time to allow DYRS to determine whether its approval is needed, and, if so, whether approval must come before the Grantee's execution of the contract, subcontract, or subgrant.
- The Grantee's contract, subcontract, or subgrant shall specify that the contractor, subcontractor, or subgrantee, and its contractors, subcontractors, or subgrantees, shall be subject to the conditions and prohibitions of the GAN.
- Warranties for labor and materials shall be obtained for purchases of materials and labor having an aggregate value of over $5,000. These warranties shall be for at least

two (2) years. DYRS may waive this requirement in writing for demonstration or research grants.

- If the Grantee, its contractors, subcontractors, or subgrantees disturbs work guaranteed under another District contract or grant, the Grantee shall be responsible to restore the disturbed work to a condition comparable to its original condition and warranty such restored work, or alternatively to pay the District for the damage.
- No Grantee shall use grant funds to procure services or materials from a vendor, contractor, or subcontractor that is suspended or debarred by the District or the federal government.

## J. Establishing and managing subawards

If the Grant authorizes or provides for subawards, the Grantee, as a pass-through entity, must:

- Ensure that all subaward agreements are in writing and address all elements for subaward agreements identified in the RFA and GAN.
- Ensure that the subawardees are aware that they are subject to all applicable terms, conditions, and requirements of the RFA, GAN, and appendices.
- Establish and follow a system for monitoring subawardee performance that includes elements required by the RFA, GAN, and appendices and report the results of the monitoring in required performance reports.
- Establish and maintain an accounting system that ensures compliance with the maximum funding limitation established in the GAN and with the requirements for payment of costs under the Grant. This includes establishment of written procedures for determining that subaward costs are allowable under the GAN, and may provide for determinations on a pre-award basis, through ongoing monitoring of costs that subgrantees incur, or a combination of both approaches, provided the Grantee documents its determinations.

## K. Entry onto a project site

The Grantee shall provide the District with access to the project site(s) and to books and records for the funded project. The Grantee also shall secure from the relevant property owner permission in writing for DYRS or its designee to access a project site/s at reasonable times to inspect the work performed by the Grantee, its contractor, subcontractor, subgrantee, or vendor. The Grantee shall obtain the written consent in advance of performing the work.

## L. Facilities controlled by the Grantee

If a facility controlled by the Grantee is used during the performance of projects under the grant, it shall meet all applicable federal, state, and local regulations for the intended use. Such a facility includes an office, training room, storage yard, or staging area.

With respect to such a facility, the Grantee shall identify an emergency site facility to finish the activities of the Grant if the primary facility becomes unavailable for use due to a catastrophic event.

Each facility controlled by the Grantee that is used for activities under the Grant shall be accessible to mobility-limited persons consistent with the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 701 et seq., and the Americans with Disabilities Act, 42 U.S.C. § 12101 et seq. This means that if a facility is not required to be modified under either Act, the Grantee need not modify it, but DYRS will require the Grantee to explain how it will seek to

accommodate mobility-limited persons.

## M.Termination

The Grant, and the offer of the Grant, shall be subject to DYRS's termination:

- At any time, in whole or in part, for the convenience of the Government should DYRS determine that such termination is in the best interest of the public or the Government;
- Immediately for:
    - Lack of funding;
    - Failure of the Grantee to follow District or applicable federal law, including statutes, rules and regulations;
    - Failure of the Grantee to carry out DYRS's ordered grant remediation plan;
    - An ethics violation involving the grant, pursuant to the ethical standards in the most recent version of the District Ethics Manual, published by the District's Board of Ethics and Government Accountability (bega.dc.gov), as of the date that the GAN was sent;
    - Cessation of insurance coverage without replacement of similar coverage; or
    - Fraud, waste or abuse.
- After the Grantee has acknowledged or otherwise signified receipt of the Grant, fourteen(14) calendar days after the Grantee receives from DYRS written notice of termination due to:
    - Force majeure, as defined and described below; or
    - Cause, as defined and described below.

## N. Termination for force majeure or cause

- For force majeure DYRS may terminate the grant and the Grantee may seek certain reimbursement, as described in this section.
- For cause DYRS may terminate the grant, but the Grantee may not receive the reimbursement allowed for termination on the basis of force majeure.
- Cause and *force majeure* defined:
    - Cause is a basis for DYRS's termination of the grant, when DYRS determines that the Grantee has:
        1. Failed to achieve the intended outputs within the time frame that has been approved;
        2. Performed incompetently, recklessly, or unlawfully.
    - Force majeure is a condition or occurrence which provides a valid excuse to failure to perform within the time frame of the grant, an unexpected and disruptive event which DYRS determines could not have reasonably been anticipated or controlled, and includes:
        3. Timely applying for a government permit or approval but not timely receiving same from the government agency;
        4. A change in applicable law;
        5. An unforeseen weather event;
        6. Organized labor strike or slowdown; and
        7. Refusal of a necessary third party to approve, agree, or participate, following the Grantee's reasonable attempts to secure same.

- The Grantee may not invoke *force majeure* as an excuse for poor planning, failure to accommodate foreseeable delays by suppliers, or the Grantee's failure to manage its own resources.
- For *force majeure,* the Grantee may seek reimbursement for otherwise-reimbursable expenditures incurred up to the date of termination, as well as reasonable costs incurred for demobilization.

## O. Unspent funds

Funds provided under this Grant, but not spent to fulfill the terms of the Grant, shall be returned immediately to DYRS upon completion of all work required under the Grant, termination of the Grant, or the Grant end date, whichever is earliest.

## P. Grant fiscal performance review and remediation plan

After eight (8) weeks of the Grantee's grant performance, DYRS may perform a complete grant fiscal compliance review to determine patterns and rates of expenditures.
If DYRS identifies deficiencies, DYRS may require that the Grantee undertake a grant remediation plan to improve and correct fiscal problems. Grant remediation may include:

- Repayment of Grant funds;
- Reduction in the Grant award; and
- Reallocation of Grant funds.

## Q. Accounting and audits

The Grantee shall maintain an accounting system that:

- Conforms to generally accepted accounting principles;
- Permits an audit of all income received and expenditures disbursed by the Grantee during performance of the activities approved for the Grant; and Allows for the identification and review of documents supporting an accounting entry.

The Grantee shall assist, and shall require that its contractors, subcontractors, and subgrantees assist, in the inspection and provision of financial records relevant to the Grant, including financial statements and tax returns. The Grantee shall seek such assistance from each vendor of a Big Grant Purchase.

At any time before final payment on this Grant, or the end of the District fiscal year in which the Grant ends, whichever is later, and for three (3) years thereafter, the District shall have the right to audit the Grantee, its contractors, subcontractors, or subgrantees. The District may, during this period, seek to audit vendors of Big Grant Purchases. If federal funds have been granted or subgranted, a federal agency may undertake such audits. The Grantee shall assist the District in obtaining the cooperation of its contractors, subcontractors, subgrantees, and vendors in such audits.

If federal funds have been included in the to the Grantee, and the Grantee spends over the following amounts of federal funds, from all sources, the Grantee shall obtain an independent audit of program expenditures in accordance with federal rules:

- A copy of the audit findings and the audit report shall be submitted to the Grant Administrator no later than thirty (30) days from the issuance of the audit findings.
- In any event, the Grantee of federal funds shall comply with all applicable federal regulations contained in 2 CFR Part 200.
- If the Grantee's fiscal year that started after 12/26/14, for an aggregate of federal funds

spent of $750,000 or more (including this Grant) in its own fiscal year, the Grantee shall obtain an independent audit of program expenditures in accordance with 2 CFR Part 200, Subpart F.

- If a federal agency undertakes an audit of the Grantee in connection with the Grant, the Grantee shall make available to DYRS all information that the audit requires, including information from its contractors, subcontractors, subgrantees, and, as practicable, vendors.
- The Grantee shall, upon DYRS request, repay to DYRS a reimbursed expenditure that DYRS has disallowed after an audit.

## Document retention for Five years

For five (5) years after the final DYRS payment of the Grant, or the end of the District fiscal year in which the Grant ends, whichever is later, the Grantee must maintain complete documentation of the Grant activities, including financial records and other documents supporting accounting entries. Upon DYRS's request, the Grantee must be able to produce for review the documentation, including for DYRS audit or, if applicable, federal audit.

- The Grantee must produce these materials for review, permit review of them, and respond promptly to questions regarding them, upon DYRS's or an auditor's request.
- If a claim, litigation, or audit is filed or commenced before the expiration of the three-year period, the documentation retention period shall be tolled, and documentation must be preserved until the claim, litigation, or audit has been finally resolved.
- The Grantee shall secure the agreement to the provisions of this section in writing from a person that this appendix subjects to an audit requirement.

## R. Attribution of funding

- When communicating in writing (including in signage, on garments, and electronically) about the activity or project which the Grant funds, the Grantee must identify publicly the support of DYRS. The Grantee shall include a DYRS logo, which DYRS will provide.
- The Grantee shall follow DYRS Sign Design Guidelines and Publication Design Guidelines.
- If federal or other funds have been subgranted, and if DYRS requests, the Grantee must similarly acknowledge the funds' source.

## S. Rights in data and other information

- DYRS retains ownership of all information produced pursuant to this Grant, including data regarding persons surveyed, interviewed, and/or counted, and any information regarding to whom services or things were provided.
- To ensure the protection of persons' confidentiality and compliance with District law and policies regarding confidentiality, the Grantee may not publish scientific or technical articles based on these data and/or information without DYRS's prior written consent.
- DYRS is, for federal funding, subject to certain information restrictions, and may require that the Grantee give notice to, and request a decision from, the federal funder.
- DYRS will not unreasonably withhold consent to a request by the Grantee for a nonexclusive license to use aggregated, non-confidential data, including for publication in professional and scientific journals and at professional meetings.
- The documents for this Grant are public documents and may be disclosed under the District's Freedom of Information Act, D.C. Official Code §§ 2-531-40. DYRS shall have the right to disclose to a third party the identity of a person providing a service or good

under this Grant and the terms of insurance obtained pursuant to this Grant.

- The Grant may involve activities in which confidential information is provided to the Grantee. DYRS may also advise the Grantee in writing as to the content and nature of confidential information. When the Grantee uses or has access to confidential information, it shall treat the information as follows:
    - The Grantee shall use confidential information only to the extent required to accomplish the purposes of this Grant
    - The Grantee shall not disclose confidential information to others without the express written permission of DYRS. Exception: The Grantee may disclose confidential information to its contractors or subgrantees who have agreed in writing to be bound by the disclosure limitations in this section
    - To be considered confidential information subject to the disclosure limitations in this section, DYRS's orally provided information shall be identified as confidential at the time of disclosure, summarized in writing and the summary delivered within thirty (30) days of disclosure.
    - Confidential information shall not pass in ownership to the Grantee. The furnishing of confidential information does not constitute a license to the Grantee to use the information for purposes beyond the activities of this Grant.
    - After being requested by DYRS to destroy confidential information, the Grantee shall return or destroy it within seven (7) days. Destruction shall be verified by the Grantee in writing by a duly authorized officer or manager. Confidential information that is not returned or destroyed shall remain subject to the confidentiality obligations set forth in this section.
    - The confidential information shall not be copied or reproduced at any time without the prior written consent of DYRS, except for distribution to employees or contractors in accordance with, and subject to, the provisions of this section.
    - The requirements of this section shall continue past the term of this Grant.
    - The Grantee shall secure from contractors and subgrantees the agreement, in writing, to be bound by this section if they use or have access to confidential information.
    - Confidential information shall include, but not be limited to: Homeowner names, phone numbers, social security numbers, financial information, and home security arrangements.

## T. Indemnification

Unless prohibited by law, the Grantee shall indemnify, defend, and hold harmless the District of Columbia and its officers, agents, and employees from any and all claims that are in any way connected to the grant. Unless prohibited by law, the Grantee shall require its principal contractors, subcontractors, subgrantees, and/or, if practicable, vendors for this Grant to do the same.

## U. Insurance

Unless DYRS waives insurance requirements in writing, the following are conditions to receipt of funds under the Grant:

- Except as provided below, the Grantee shall obtain the following minimum insurance

coverages and keep such insurance coverage in force throughout the grant period:

- Commercial General Liability Insurance: one million dollars ($1,000,000) limit per occurrence, and two million dollars ($2,000,000) aggregate, with the District added as additional insured;
- Automobile Liability Insurance: one million dollars ($1,000,000) per occurrence combined single unit;
  - Provide that the insurance coverage provided thereunder will be primary and noncontributory with any other applicable insurance; and
  - Contain a waiver of subrogation in favor of the District of Columbia.
- The Grantee may submit a Certificate of Insurance giving evidence of the required coverage either before or after the date of the GAN, but DYRS must receive it before DYRS makes a payment of Grant funds.
- The requirements of this section shall not apply to a government agency that provides one of the following:
  - For an agency of the District of Columbia, a written statement that the agency complies with the intent of the paragraph by requiring insurance for all activities not carried out by District employees; and
  - For a non-District government agency, a written statement (a) that the agency is self-insured, (b) that the self-insurance is primary and non-contributory with any other insurance maintained by the District of Columbia, and (c) identifying the self-insurance fund.
- Workers' Compensation Insurance according to the statutes of the District of Columbia, including Employer's Liability of at least:
  - One hundred thousand dollars ($100,000) per accident for injury;
  - Five hundred thousand dollars ($500,000) per employee for disease; and
  - Five hundred thousand dollars ($500,000) policy limit for disease;
- Umbrella/Excess Liability Insurance: two million dollars ($2,000,000) limit per occurrence; and
  - Professional Liability Insurance: two million dollars ($2,000,000) limit per claim;
  - When District property or a District facility is used, crime insurance (third party indemnity) to cover the dishonest acts of employees of the Grantee, its contractors, subcontractors, and subgrantees that result in loss to the District; and
  - Sexual/Physical Abuse and Molestation insurance if minors are involved in the services provided, and no other policy covers the matter, in the amount of one million dollars ($1 million) per occurrence and two million dollars ($2 million) aggregate, with the District as an additional insured.
  - For each project conducted on federal property, in addition to the coverages in paragraph "a." of this section:
    - The Grantee and its subgrantees must procure public and employee liability insurance from responsible companies with a minimum limitation to be the greater of:
      - One million dollars ($1,000,000) per person for any one claim, and an aggregate limit of three million dollars ($3,000,000) for any number of claims arising from any one incident; or
      - The minimum required by law; if any

- The United States of America must be named as an additional insured on each such policy;
- Each such policy shall specify that the insured shall have no right of subrogation against the United States for payments of any premiums or deductibles thereunder; and
- Each such policy shall be obtained by the insured, be for the account of the insured, and be at the insured's sole risk.

- Each insurance policy obtained by the Grantee shall:
  - Be written with a company licensed by (a) the state in which the Grantee's principal offices are located and qualified to write insurance policies in the District of Columbia, or (b) the District of Columbia;
  - Provide for at least thirty (30) days' written notice to DYRS prior to termination or material alteration; and
  - Be written by a company that is financially responsible, with either an A.M. Best Company financial strength and financial size category rating of A-VIII or higher, a Standard & Poor's rating of AA or higher, or a Moody's rating of Aa2 or higher.
- The Grantee shall require each Grant-related contractor, subcontractor, or subgrantee, to carry the Grant-related insurance required herein, or the Grantee may, at its option, provide the coverage for the entity.
- Unless otherwise prohibited by law, each policy (excluding otherwise applicable Workers' Compensation or Professional Liability) shall:
  - Name the District as an additional insured with respect to work or services performed under the grant or subgrant;

## V. Special provisions for certain programs or projects

Special provisions are written into the Request for Applications

## W. Requests for reconsideration of certain DYRS decisions

In certain limited circumstances DYRS provides the following procedure for an applicant to seek review or reconsideration of a grant-making decision:

### A. Request for reconsideration

When the Department decides to award a grant to a successful applicant, it will notify in writing each applicant whose application was not selected for award. At the Department’s discretion this notification may include a statement regarding eligibility, a reviewer’s evaluation and comments, or a summary. It will not identify a reviewer or provide the contents of an application. Written notification may be made electronically, typically by email.

If an unsuccessful applicant wishes to better understand the decision regarding a grant, the applicant may ask the Department’s Grants Division for further information. The Department may meet with the applicant, explain the decision, and may provide reviewer evaluation, comment, or a summary.

If an unsuccessful applicant wishes the Department to reconsider the decision, the applicant must file a “Request for Reconsideration” in writing within seven (7) days of the date of the Department’s notification. The filing should be addressed to the Supervisory

Grants Management Specialist

- A written request may be made electronically, typically by email to the published email address for the grant competition. The Department encourages electronic communication.
- A Request for Reconsideration must include a concise statement of the reason(s) for the request and include all documentation and other evidence supporting the request.
- A request must identify the reasons for reconsideration and provide supporting evidence, or it will be denied.

## B. Department response

- A change to the award decision will be made only because of fraud, a criminal act, or a material error in the determination of eligibility.
- The Supervisory Grants Management Specialist, or designee, will consider the Request for Reconsideration and the evidence provided.
- Ordinarily a decision will be issued within seven (7) days, except the Supervisory Grants Management Specialist may extend that time, and will notify the requestor in writing of an extension.
- The Supervisory Grants Management Specialist may halt the award of the grant while the Request for Reconsideration is pending.
- After reconsideration, the Supervisory Grants Management Specialist will inform the requestor in writing of the determination.
- If the Supervisory Grants Management Specialist determines that a valid basis for a change to the award exists, the Supervisory Grants Management Specialist may:
    - Reopen the grant application process, in whole or in part;
    - Revise or revoke an award; or
    - Take other appropriate action to address an error.

## C. Effect of the award

Unless the Department states otherwise in writing, either (a) seven (7) days after a grant's announcement, or (b) upon affirmation of a grant after considering a request for reconsideration, an award of the grant constitutes final Department action on the grant.

**GOVERNMENT OF THE DISTRICT OF COLUMBIA**
Department of Youth Rehabilitation Services

Reverend Judie Sheperd-Gore
Executive Director
InnerCity Collaborative Community
5219 Call Place SE
Washington, DC 20019

RE: Grant Award Modification 2026-CMI-06

Dear Reverend Judie,

The Department of Youth Rehabilitation Services is pleased to offer continuation of the 2025 supplemental funding from Child and Family Services (CFSA) to connect high risk individuals aged 14-21, and their families, to Credible Messenger Services.

The modification increases the not to exceed value of Grant 2026-CMI-06 by $150,000 for a not to exceed total grant value of $825,000. Additionally, the modification expands the original scope of work to serve up to 16 CFSA referred youth during fiscal year 2026 under the Credible Messenger Initiative. Except as specifically modified by this amendment, all other terms, conditions, requirements and provisions of the original Grants Agreement shall remain in full force and effect as originally stated.

If you accept this modification, please email the DYRS grants management division please sign and return the grant award modification below.

Thank you for working to ensure increased public safety and the rehabilitation of youth and families in the District of Columbia.

Sincerely,

Briana Huggins
Business Operations Manager

DYRS
DEPARTMENT OF YOUTH REHABILITATION SERVICES

**District of Columbia Department of Youth Rehabilitation Services**

**Grant Award Modification**

**Modification No.:** 01
October 28, 2025

| | |
|---|---|
| **Grantee:** | InnerCity Collaborative Community |
| **Grant Number:** | 2026-CMI-06 |
| **Grant Name:** | Credible Messenger Initiative |
| **Grant Amount:** | $825,000 |
| **Grant period:** | October 1, 2024 – September 30, 2025 |
| **Funding Source:** | Local Funds |

**Allocation:** Total Funding Amount [$825,000.00]

**Purpose of Modification**: This modification is issued to increase the not to exceed value of the 2026-CMI-06 grant award from $675,000 to $825,000 and to expand the scope of services to serve up to 16 CFSA referred youth during the 2026 fiscal year

Specifically, the following changes are hereby made:

- [Change 1]: Increase the not to exceed value of Grant 2026-CMI-06 by $150,000 for Fiscal Year 2026
- [Change 2]: Provide Credible Messenger services, as detailed in the original scope of work, to up to 16 CFSA referred youth in Fiscal Year 2026.

All other terms and conditions of the original award remain in full force and effect, expect as specifically modified in this document.

**Signature**
Briana Huggins,
DYRS Business Operations Manager

Signature [signature]

Date: 10.30.25

**Signature**
Reverend Judie Shepher-Gore
ICC Executive Director

Signature Rev. Judie Shepher-Gore

Date: 10/31/2025

**GOVERNMENT OF THE DISTRICT OF COLUMBIA**
Department of Youth Rehabilitation Services

Reverend Judie Sheperd-Gore
Executive Director
Inner City Collaborative Community
5219 Call Place SE
Washington, D.C 20019

RE: Grant Award Modification 02: 2026-CMI-06

Dear Reverend Judie,

The Department of Youth Rehabilitation Services submits notice of a modification to remove and replace the deliverable's table included in the original grant award 2026-CMI-06, issued on October 1, 2025, and to be replaced by the following:

*Deliverable Table:*

| Deliverables | Description | Submit to | Due Dates |
|---|---|---|---|
| Staff Background Checks | Grantees and staff members are required to submit employee names for clearance to work with DYRS youth and families. The clearance screenings include: Child Protection Registry Clearance, DC Criminal Background Check Clearance, Drug Screen Clearance, FBI Criminal Background Clearance, and National Sex Offender Registry Clearance. | DYRS leads and shares results | October 1 (Completed 2x per year; every 6months) Must be completed before Oct 1st. Possibly, last Friday of Sept. |
| Group/Activity Sign in Sheets | Group and Activity sign in sheets. | Credible Messenger Leadership and CC Grants Compliance Monitor. | Due by 12pm every Friday. |
| Weekly FamCare Notes | Effective Documentation of all engagements/interactions regarding the assigned youth/family. | FamCare | Due w/in 48hrs. of the engagement. |
| Monthly Lesson Plans | Lesson Plans serve as the blueprint to the weekly mentoring groups as well as activities that are decided upon for the week/month for the youth. Its lessons are based on the seven pillars that represent the essential foundation for developing a sense of self-worth. This curriculum is the basis for the group-mentoring sessions facilitated by the Credible Messengers, and the learnings from these sessions are meant to translate into youths' everyday lives. | Credible Messenger Leadership and CC Grants Compliance Monitor. | Monthly-Due the 1st Friday of the month. |
| Monthly Family | A monthly form which governs the | Credible Messenger | 25th of each month |

GOVERNMENT OF THE DISTRICT OF COLUMBIA
Department of Youth Rehabilitation Services

| | | | |
|---|---|---|---|
| Engagement Form | FEM's work with their assigned families. The form depicts the family's strengths/challenges; desired outcomes/goals; progress/barriers and overall synopsis of the family's success/barriers to goal attainment every 30days. The CM-Family Engagement Specialists reviews all of the submitted updates each month in an effort to provide valuable feedback to the FEM's during their monthly review call. | Leadership and CC Grants Compliance Monitor. | or the next business day if the 25th falls on a weekend/holiday |
| Monthly activities calendar | A detailed monthly calendar detailing planned activities. Should include activity description, time, location and purpose. Must reflect at least 1 youth activity and 1 family engagement activity. | Credible Messenger Leadership and CC Grants Compliance Monitor. | 1st of the month |
| Monthly Staffing/Mentoring Assignment List (MS/MA) | Doc entails the current staffing and a list of all current youth/families assigned. This includes contact info such as addresses, youth's placement; contact number, assigned CC; Dob, age. It also reflects the number of youth/families assigned to each CM/FEM. | Credible Messenger Leadership and CC Grants Compliance Monitor | 5th of each month. If the 5th falls on a weekend and/or holiday, due the following business day |
| Monthly Supervision Form | Document which reflects the mentors strengths/challenges, to include steps that the PC (supervisor) will take to assist the staff with growth. The document also depicts an overview of the mentors caseload, which includes the youth/families successes and challenges as well as support that's needed to further address the youth/families. | Do not submit. Keep on file for audit. | Monthly |
| Monthly Invoice/Reconciliation Report | Monthly invoice with all support documentation in accordance with DYRS financial checklist and financial policy | Management Analyst- Financial and CC Grants Compliance Monitor and Credible Messenger Leadership | Due the 10th |
| Quarterly Programmatic Report | Please use DYRS template to submit a written report to include:<br>Activities completed in the quarter (planned vs executed)<br>Achievements and Challenges (major accomplishments and challenges encountered/lessons learned)<br>Progress toward outputs and outcomes | Credible Messenger Leadership and CC Grants Compliance Monitor | Due the 15th of the following month after the close of a quarter (i.e October-December is due January 15th) |

**GOVERNMENT OF THE DISTRICT OF COLUMBIA**
Department of Youth Rehabilitation Services

| | | | |
|---|---|---|---|
| | (progress to targets)<br>Deliverable Completion<br>Financial outlook.<br>Outcomes Report | | |
| Bi-annual Checkr Check | DYRS will conduct a bi-annual background check on all current/ newly proposed staff under the grant award | N/A DYRS Leads and shared results | March 30, 2026 |
| Final Report | Please use DYRS template to submit a written report to include:<br>Activities completed in the year (planned vs executed)<br>Achievements and Challenges (major accomplishments and challenges encountered/lessons learned)<br>Final achievement toward outputs and outcomes (progress to targets)<br>Financial Expense Report (summary of expended cost categories) | Credible Messenger Leadership and CC Grants Compliance Monitor. | September 15, 2026 |

Except as specifically modified by this amendment, all other terms, conditions, requirements and provisions of the original Grants Agreement shall remain in full force and effect as originally stated.

If you accept this modification, please sign and return the grant award modification below.

Thank you for working to ensure increased public safety and the rehabilitation of youth and families in the District of Columbia.

Sincerely,

Daniela Farinas
Supervisory Grants Management Specialist

**GOVERNMENT OF THE DISTRICT OF COLUMBIA**
Department of Youth Rehabilitation Services

**District of Columbia Department of Youth Rehabilitation Services**

**Grant Award Modification**

**Modification No:** 02
January 8, 2026

**Grantee:** InnerCity Collaborative Community
**Grant Number:** 2026-CMI-06
**Grant Name:** Credible Messenger Initiative
**Grant Amount:** $825,000
**Grant period:** October 1, 2025 – September 30, 2026
**Funding Source:** Local Funds

**Allocation:** Total Funding Amount [$825,000.00]

**Purpose of Modification**: This modification is issued to remove the original deliverables table included in the FY2026-CMI-06 Grant Award and replace with the updated deliverable table below:

| Deliverables | Description | Submit to | Due Dates |
|---|---|---|---|
| Staff Background Checks | Grantees and staff members are required to submit employee names for clearance to work with DYRS youth and families. The clearance screenings include: Child Protection Registry Clearance, DC Criminal Background Check Clearance, Drug Screen Clearance, FBI Criminal Background Clearance, and National Sex Offender Registry Clearance. | DYRS leads and shares results | October 1 (Completed 2x per year; every 6months) Must be completed before Oct 1st. Possibly, last Friday of Sept. |
| Group/Activity Sign in Sheets | Group and Activity sign in sheets. | Credible Messenger Leadership and CC Grants Compliance Monitor. | Due by 12pm every Friday. |
| Weekly FamCare Notes | Effective Documentation of all engagements/interactions regarding the assigned youth/family. | FamCare | Due w/in 48hrs. of the engagement. |
| Monthly Lesson Plans | Lesson Plans serve as the blueprint to the weekly mentoring groups as well as activities that are decided upon for the week/month for the | Credible Messenger Leadership and CC Grants Compliance | Monthly-Due the 1st Friday of the month. |

GOVERNMENT OF THE DISTRICT OF COLUMBIA
Department of Youth Rehabilitation Services

| | | | |
|---|---|---|---|
| | youth. Its lessons are based on the seven pillars that represent the essential foundation for developing a sense of self-worth. This curriculum is the basis for the group-mentoring sessions facilitated by the Credible Messengers, and the learnings from these sessions are meant to translate into youths' everyday lives. | Monitor. | |
| Monthly Family Engagement Form | A monthly form which governs the FEM's work with their assigned families. The form depicts the family's strengths/challenges; desired outcomes/goals; progress/barriers and overall synopsis of the family's success/barriers to goal attainment every 30days. The CM-Family Engagement Specialists reviews all of the submitted updates each month in an effort to provide valuable feedback to the FEM's during their monthly review call. | Credible Messenger Leadership and CC Grants Compliance Monitor. | 25th of each month or the next business day if the 25th falls on a weekend/holiday |
| Monthly activities calendar | A detailed monthly calendar detailing planned activities. Should include activity description, time, location and purpose. Must reflect at least 1 youth activity and 1 family engagement activity. | Credible Messenger Leadership and CC Grants Compliance Monitor. | 1st of the month |
| Monthly Staffing/Mentoring Assignment List (MS/MA) | Doc entails the current staffing and a list of all current youth/families assigned. This includes contact info such as addresses, youth's placement; contact number, assigned CC; Dob, age. It also reflects the number of youth/families assigned to each CM/FEM. | Credible Messenger Leadership and CC Grants Compliance Monitor | 5th of each month. If the 5th falls on a weekend and/or holiday, due the following business day |
| Monthly Supervision Form | Document which reflects the mentors strengths/challenges, to include steps that the PC (supervisor) will take to assist the staff with growth. The document also depicts an overview of the mentors caseload, which includes the youth/families successes and challenges as well as support that's needed to further address the youth/families. | Do not submit. Keep on file for audit. | Monthly |
| Monthly Invoice/Reconciliation | Monthly invoice with all support documentation in accordance with | Management Analyst- Financial | Due the 10th |

GOVERNMENT OF THE DISTRICT OF COLUMBIA
Department of Youth Rehabilitation Services

| | | | |
|---|---|---|---|
| Report | DYRS financial checklist and financial policy | and CC Grants Compliance Monitor and Credible Messenger Leadership | |
| Quarterly Programmatic Report | Please use DYRS template to submit a written report to include:<br>1. Activities completed in the quarter (planned vs executed)<br>2. Achievements and Challenges (major accomplishments and challenges encountered/lessons learned)<br>3. Progress toward outputs and outcomes (progress to targets)<br>4. Deliverable Completion<br>5. Financial outlook.<br>6. Outcomes Report | Credible Messenger Leadership and CC Grants Compliance Monitor | Due the 15th of the following month after the close of a quarter (i.e October- December is due January 15th) |
| Bi-annual Checkr Check | DYRS will conduct a bi-annual background check on all current/ newly proposed staff under the grant award | N/A DYRS Leads and shared results | March 30, 2026 |
| Final Report | Please use DYRS template to submit a written report to include:<br>1. Activities completed in the year (planned vs executed)<br>2. Achievements and Challenges (major accomplishments and challenges encountered/lessons learned)<br>3. Final achievement toward outputs and outcomes (progress to targets)<br>4. Financial Expense Report (summary of expended cost categories) | Credible Messenger Leadership and CC Grants Compliance Monitor. | September 15, 2026 |

**GOVERNMENT OF THE DISTRICT OF COLUMBIA**
Department of Youth Rehabilitation Services

Specifically, the following changes are hereby made:

- [Change 1]: Remove and Replace the Deliverables table included in the FY2026-CMI-06 Grant Award for the deliverables table included in modification 02.

All other terms and conditions of the original award remain in full force and effect, expect as specifically modified in this document.

**Signature**
Daniela Farinas
DYRS Supervisory Grants Management Specialist

Signature____________________

Date: 01/09/2026

**Signature**
Reverend Judie Sheperd-Gore
Inner City Collaborative Community

Signature____________________

Date: 1/30/26

**GOVERNMENT OF THE DISTRICT OF COLUMBIA**
Department of Youth Rehabilitation Services

**District of Columbia Department of Youth Rehabilitation Services**

**Grant Award Modification**

**Modification No:** 03
February 25, 2026

**Grantee:** **InnerCity Collaboraive Community**
**Grant Number:** 2026-CMI-06
**Grant Name:** Credible Messenger Initiative
**Original Grant Amount:** $675,000.00
**Modified Grant Amount:** $ 825,000
**Grant period:** October 1, 2025 – September 30, 2026
**Funding Source:** Local Funds

**Allocation:** Total Funding Amount [$307,207.25]

**Purpose of Modification**: This modification is to terminate grant agreement 2026-CMI-06.

Specifically, the following changes are hereby made:

- [Change 1]: Reduce "**Grant Amount:** $825,000" *and replace with* "**Grant Amount:** $ $307,207.25
- [Change 2]: Replace **Grant Period:** October 1, 2025 through September 30, 2026, *with* "**Grant Period:** October 1, 2025, through February 20, 2026
- [Change 3]: Remove and Replace the Deliverable table included in Grant 2026-CMI-06 with the below

| **Deliverables** | **Description** | **Submit to** | **Due Dates** |
|---|---|---|---|
| Staff Background Checks | Grantees and staff members are required to submit employee names for clearance to work with DYRS youth and families. The clearance screenings include: Child Protection Registry Clearance, DC Criminal Background Check Clearance, Drug Screen Clearance, FBI Criminal Background Clearance, and National Sex Offender Registry Clearance. | DYRS leads and shares results | October 2025. |
| Group/Activity Sign in Sheets | Group and Activity sign in sheets. | Credible Messenger Leadership and CC Grants Compliance Monitor. | Due by 12pm every Friday until February 20, 2026 |
| Weekly FamCare Notes | Effective Documentation of all engagements/interactions regarding the assigned youth/family. | FamCare | Due w/in 48hrs. of the engagement until February 20, 2026 |

**GOVERNMENT OF THE DISTRICT OF COLUMBIA**
Department of Youth Rehabilitation Services

| | | | |
|---|---|---|---|
| Monthly Lesson Plans | Lesson Plans serve as the blueprint to the weekly mentoring groups as well as activities that are decided upon for the week/month for the youth. Its lessons are based on the seven pillars that represent the essential foundation for developing a sense of self-worth. This curriculum is the basis for the group-mentoring sessions facilitated by the Credible Messengers, and the learnings from these sessions are meant to translate into youths' everyday lives. | Credible Messenger Leadership and CC Grants Compliance Monitor. | Monthly-Due the 1st Friday of the month until February 1, 2026. |
| Monthly Family Engagement Form | A monthly form which governs the FEM's work with their assigned families. The form depicts the family's strengths/challenges; desired outcomes/goals; progress/barriers and overall synopsis of the family's success/barriers to goal attainment every 30days. The CM-Family Engagement Specialists reviews all of the submitted updates each month in an effort to provide valuable feedback to the FEM's during their monthly review call. | Credible Messenger Leadership and CC Grants Compliance Monitor. | 25th of each month or the next business day if the 25th falls on a weekend/holiday until January 25, 2026 |
| Monthly activities calendar | A detailed monthly calendar detailing planned activities. Should include activity description, time, location and purpose. Must reflect at least 1 youth activity and 1 family engagement activity. | Credible Messenger Leadership and CC Grants Compliance Monitor. | 1st of the month until February 2026 |
| Monthly Staffing/Mentoring Assignment List (MS/MA) | Doc entails the current staffing and a list of all current youth/families assigned. This includes contact info such as addresses, youth's placement; contact number, assigned CC; Dob, age. It also reflects the number of youth/families assigned to each CM/FEM. | Credible Messenger Leadership and CC Grants Compliance Monitor | 5th of each month. If the 5th falls on a weekend and/or holiday, due the following business day. Due until February 5, 2026 |
| Monthly Supervision Form | Document which reflects the mentors strengths/challenges, to include steps that the PC (supervisor) will take to assist the staff with growth. The document also depicts an overview of the mentors caseload, which includes the youth/families successes and challenges as well as support that's needed to further address the youth/families. | Do not submit. Keep on file for audit. | Monthly until February 2026 |
| Monthly Invoice/Reconciliation Report | Monthly invoice with all support documentation in accordance with DYRS financial checklist and financial policy | Management Analyst- Financial and CC Grants Compliance Monitor | Due the 10th of each month until February 2026 |

**GOVERNMENT OF THE DISTRICT OF COLUMBIA**
Department of Youth Rehabilitation Services

| | | | |
|---|---|---|---|
| | | and Credible Messenger Leadership | |
| Quarterly Programmatic Report | Please use DYRS template to submit a written report to include: Who is responsible for the info below?<br><br>1. Activities completed in the quarter (planned vs executed)<br>2. Achievements and Challenges (major accomplishments and challenges encountered/lessons learned)<br>3. Progress toward outputs and outcomes (progress to targets)<br>4. Deliverable Completion<br>5. Financial outlook.<br>6. Outcomes Report | Credible Messenger Leadership and CC Grants Compliance Monitor | Due January 15, 2026 |

- [Change 4]: Remove and Replace the Activities included in Grant 2026-CMI-06 with the below:

**Activity #1- Attend Provider Onboarding.**
Participate in an inaugural grant award meeting and subsequent trainings to discuss grant objectives, approved budget, program outcomes, grantor expectations and Standard Operating Procedures.

**Activity #2- Attend and Participate in Meetings and Trainings.**
Attend all meetings and training as scheduled through February 20, 2026.

**Activity #3- Attend Team Decision Making Meetings.**
Attend TDM meetings every 90 days led by Care Coordination and help incorporate youth and family voice into success plan development and adaptation until February 20, 2026.

**Activity #4- Ensure all staff receive clearances in October 2025.**
Communicate with DYRS appointed staff as needed to ensure all staff are fully cleared at the start of the award. Maintain files and storage for all clearance documentation.

**Activity #5- Required documentation submission.**
The Credible Messenger will collaborate with DYRS to ensure that all necessary information pertaining to youth's identified goals listed in ISP (Individual Success Plan), is properly documented and submitted into FamCare in a timely manner until February 20, 2026.

Credible Messengers are required to adhere to the detailed protocols for appropriately providing services to participants and/or families, tracking interactions, documenting activities within FamCare & SharePoint, reporting outcomes, submitting timely and accurate invoicing, attending mandatory meetings and trainings, etc until February 20, 2026.

**Activity #7- Participate in monthly and/or quarterly site audits.**
Participate in the fiscal year 2026 Quarter 1 site visit. Site visits are a key component of an overall strategy to ensure quality of services that deliver positive outcomes for participants and are a summary of contract monitoring measures that occur.

**GOVERNMENT OF THE DISTRICT OF COLUMBIA**
Department of Youth Rehabilitation Services

*All other terms and conditions of the original award remain in full force and effect, expect as specifically modified in this document.*

**Signature**
Daniela Farinas
DYRS Supervisory Grants Management Specialist

Signature________________

Date: 03-04-2026________

**Signature**
Reverend Judie Sheperd-Gore
InnerCity Collaborative Community

Signature________________

Date: 3-6-26________________

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

**DISTRICT OF COLUMBIA**
c/o Mayor Muriel Bowser
1350 Pennsylvania Ave. NW
Washington, DC 20004

c/o Attorney General Brian Schwalb
400 6th St. NW
Washington, DC 20001

*Plaintiff-in-Interpleader*,

v.

**INNERCITY COLLABORATIVE COMMUNITY DEVELOPMENT CORPORATION**
5219 Call Place SE
Washington, DC 20019

*and*

**PEARL ALPHA FUNDING, LLC d/b/a PEARL CAPITAL**
55 Almeria Avenue
2nd Floor
Coral Gables, FL 33134

*and*

**INTERNAL REVENUE SERVICE**
1111 Constitution Avenue, NW
Washington, DC 20224

*Claimant-Defendants.*

Civil Action No. 1:26-cv-4153

**EXHIBIT 2**

**Invoice Number MAR2026CMIICCDC**

# DYRS FY26 Community Programming Initiative

## Request for Reimbursement Invoice

**Bill To:**
DC Dept of Youth Rehabilitation Services
Please use https://vendorportal.dc.gov to register and submit invoices
Purchase Order #

**Payment to:** INNER CITY
**Address:** 5219 Call Place SE
WASHINGTON, DC 20019
**Telephone #:** 202-304-6822
**Tax ID #:** [redacted]

**Service Area:** Credible Messenger
**Grant #/Contract #:** 2026-CMI-06
**Grant Period:** 10/01/2025 - 09/30/2026
**Invoice #:** MAR2026CMIICCCDC
**Invoice Date:** 4/2/2026
**Current Invoice Period:** 3/1/2026 - 3/31/2026

| | Budget Line Items | Current Expenses | Prior Invoiced Expenses | Cumulative Expenses | Approved Budget | Available Budget Amount | Budget Spent % |
|---|---|---|---|---|---|---|---|
| Direct Personnel | SALARIES/ WAGES | $ 11,654.83 | $ 190,302.01 | $ 201,956.84 | $ 581,750.00 | $ 379,793.16 | 35% |
| | FRINGE BENEFITS | $ 1,165.48 | $ 19,030.20 | $ 20,195.68 | $ 58,175.00 | $ 37,979.32 | 35% |
| | *SUBTOTAL* | $ 12,820.31 | $ 209,332.21 | $ 222,152.52 | $ 639,925.00 | | |
| Other Direct Costs | ACTIVITY FUND | | $ 4,464.68 | $ 4,464.68 | $ 28,023.00 | $ 23,558.32 | 16% |
| | EQUIPMENT | | $ - | $ - | $ 11,244.00 | $ 11,244.00 | 0% |
| | SUPPLIES | | $ 1,681.65 | $ 1,681.65 | $ 3,000.00 | $ 1,318.35 | 56% |
| | OTHER DIRECT COSTS | $ 159.13 | $ 3,792.66 | $ 3,951.79 | $ 10,000.00 | $ 6,048.21 | 40% |
| | EMERGENCY FUND | | $ - | $ - | $ 2,000.00 | $ 2,000.00 | 0% |
| | TRAVEL & TRANSPORTATION | | $ 89.70 | $ 89.70 | $ 23,200.00 | $ 23,110.30 | 0% |
| | *SUBTOTAL* | $ 159.13 | $ 10,028.69 | $ 10,187.82 | $ 77,467.00 | | |
| | INDIRECT COST 15% | $ 1,946.92 | $ 32,904.14 | $ 34,851.05 | $ 107,608.00 | $ 72,756.95 | 32% |
| | ***TOTAL EXPENSES*** | **$ 14,926.36** | **$ 252,265.04** | **$ 267,191.39** | **$ 825,000** | **$ 557,809** | **32%** |

***CURRENT TOTAL INVOICED*** **$ 14,926.36**

**I hereby certify to the best of my knowledge and belief that this Request for Reimbursement Invoice is true, complete, and accurate, and the expenses, disbursements and cash receipts were for the purposes and objectives set forth in the terms and conditions of the grant award and that payment is due and has not been previously received. I understand that typing my name below is the same as signing my signature using pen and paper.**

**PREPARED BY:** *Lakisha Johnson Evans* 4/10/2026
Date

**CERTIFIED BY:** *Reverend Judie S. Gore* 4/10/2026
*(Signature of Authorized Certifying Official)* Date

**Please contact [Preparer's Name] at [direct email address] and [direct telephone number] in the event of a defective invoice or for any other questions regarding this invoice.**

**DO NOT SIGN IN THIS SECTION - FOR DYRS USE ONLY**

**VERIFIED & APPROVED BY:** *Patrone A. Baker* 5/5/2026
*(Signature of Authorized Certifying Official)* **Date Received**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

**DISTRICT OF COLUMBIA**
c/o Mayor Muriel Bowser
1350 Pennsylvania Ave. NW
Washington, DC 20004

c/o Attorney General Brian Schwalb
400 6th St. NW
Washington, DC 20001

*Plaintiff-in-Interpleader*,

v.

**INNERCITY COLLABORATIVE COMMUNITY DEVELOPMENT CORPORATION**
5219 Call Place SE
Washington, DC 20019

*and*

**PEARL ALPHA FUNDING, LLC d/b/a PEARL CAPITAL**
55 Almeria Avenue
2nd Floor
Coral Gables, FL 33134

*and*

**INTERNAL REVENUE SERVICE**
1111 Constitution Avenue, NW
Washington, DC 20224

*Claimant-Defendants.*

Civil Action No. 1:26-cv-4153

**EXHIBIT 3**

**UCC Lien Notice**

Pearl Alpha Funding, LLC

March 30, 2026

DC Office of Contracting and Procurement
441 4th Street, NW, Suite 330 South
Washington, District of Columbia 20001

To Whom It May Concern:

Please see the enclosed UCC Lien Notice and the supporting documents. I hereby request and advise that no additional funds be sent to the **Merchant** named below and that a hold be placed on its accounts receivable.

INNERCITY COLLABORATIVE COMMUNITY DEVELOPMENT CORPORATION
5219 Call Place SouthEast
Washington, District of Columbia 20019

Please also note that the lien notice has been authenticated by the Secured Party, Pearl Alpha Funding, LLC.

Sincerely,

Vijay G. Brijbasi, Esq.

Pearl Alpha Funding, LLC

March 30, 2026

Attention: DC Office of Contracting and Procurement
441 4th Street, NW, Suite 330 South
Washington, District of Columbia 20001

**UCC LIEN NOTICE AND NOTICE OF GUARANTY OF PERFORMANCE GRANTED BY MERCHANT TO SECURED CREDITOR Pearl Alpha Funding, LLC GIVING Pearl Alpha Funding, LLC PERFECTED SECURITY INTEREST OVER ACCOUNT RECEIVABLES OF MERCHANT**

Re: INNERCITY COLLABORATIVE COMMUNITY DEVELOPMENT CORPORATION
EIN: 46-0854156
**Balance due to Pearl Alpha Funding, LLC**: $85,370.20

Dear Sir/Madam

This notice is being sent to you pursuant to the Uniform Commercial Code ("UCC") Sections 9-406, 9-601, and 9-607 because Pearl Alpha Funding, LLC (the "Secured Party") has a good-faith belief that you may have a balance owed to Innercity Collaborative Community Development Corporation (the "Merchant"), located at 5219 Call Place SouthEast Washington, District of Columbia 20019.

Pursuant to the enclosed Sale of Future Receipts Agreement (the "Agreement"), which includes a Security Agreement: (i) **Secured Party** purchased $200,000.00 of the **Merchant**'s future accounts; (ii) the **Merchant** assigned a portion of its right, title and interest in and to its future accounts (the "**Secured Assets**") to **Secured Party**; (iii) **Secured Party** received a security interest in and to the **Secured Assets**, which was perfected by the filing of a Uniform Commercial Code financing statement ("UCC-1") with the applicable Secretary of State, a copy of which is also enclosed (Note: **Secured Party** and CT Corporation System have an agency relationship that allows CT Corporation System to file UCC Financing Statements on **Secured Party**'s behalf).

The **Agreement** is structured so that upon a breach of the **Agreement** by **Merchant**, **Secured Party**'s portion of the **Merchant's** future accounts increased to 100%.

The **Merchant** has breached in the performance of the **Agreement**, and, to this day, remains in breach pursuant to its obligations under the **Agreement**.

**Pursuant to UCC sections 9-406 and 9-607, you are hereby advised not to disburse any funds to the Merchant after the date hereof – doing so will not discharge your obligation to the Secured party and may well subject you to multiple liability** for amount equal to that which has been paid to **Merchant** (see **UCC 9-406(a)**) Even if you have an agreement with the **Merchant** that prevents **Merchant** from assigning it's accounts and future accounts, that agreement is ineffective in regards to the **Secured Party's** intertest in the **Secured Assets**. Your obligations can only be satisfied by paying the **Secured Party** and I hereby **request that you do so (see UCC 9-406(a))**. I encourage you to: (a) place a hold on the Merchant's account(s); (b) contact the **Merchant** and advise it of this notice/request; and (c) contact your attorney to verify that paying the **Merchant will not satisfy your obligations to the Secured Party and may subject you to multiple liability** (the amount you paid to Merchant plus the amount you owe to **Secured Party**).

Pearl Alpha Funding, LLC

By:
Vijay G. Brijbasi, Esq.
Chief Compliance Officer

**Secured Party:**

Pearl Alpha Funding, LLC

Signed By:________________
Oded Segev, Chief Financial Officer.

Enclosures

Doc #: 2025112987
11/19/2025 12:36 PM

# UCC FINANCING STATEMENT

FOLLOW INSTRUCTIONS

A. NAME & PHONE OF CONTACT AT SUBMITTER (optional)
Name: Wolters Kluwer Lien Solutions Phone: 800-331-3282 Fax: 818-662-4141

B. E-MAIL CONTACT AT SUBMITTER (optional)
uccfilingreturn@wolterskluwer.com

C. SEND ACKNOWLEDGMENT TO: (Name and Address)

Lien Solutions
P.O. Box 29071
Glendale, CA 91209-9071

106645502
DCDC

File with: District of Columbia, DC

**SEE BELOW FOR SECURED PARTY CONTACT INFORMATION**

**THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY**

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

1a. ORGANIZATION'S NAME
Innercity Collaborative Community Development Corp

OR

| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX | |
|---|---|---|---|---|
| | | | | |
| **1c. MAILING ADDRESS** | **CITY** | **STATE** | **POSTAL CODE** | **COUNTRY** |
| 5219 Call Pl SE | Washington DC | DC | 20019 | USA |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

2a. ORGANIZATION'S NAME
Innercity Collaborative Community Development Co

OR

| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX | |
|---|---|---|---|---|
| | | | | |
| **2c. MAILING ADDRESS** | **CITY** | **STATE** | **POSTAL CODE** | **COUNTRY** |
| 5219 Call Pl SE | Washington DC | DC | 20019 | USA |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

3a. ORGANIZATION'S NAME
C T CORPORATION SYSTEM, AS REPRESENTATIVE

OR

| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX | |
|---|---|---|---|---|
| | | | | |
| **3c. MAILING ADDRESS** | **CITY** | **STATE** | **POSTAL CODE** | **COUNTRY** |
| 330 N Brand Blvd, Suite 700; Attn: SPRS | Glendale | CA | 91203 | USA |

4. COLLATERAL: This financing statement covers the following collateral:
Merchant's now owned and hereafter acquired accounts and payment intangibles, and their respective proceeds, as those terms are defined in the Uniform Commercial Code

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box:
☐ Public-Finance Transaction ☐ Manufactured-Home Transaction ☐ A Debtor is a Transmitting Utility

6b. Check only if applicable and check only one box:
☐ Agricultural Lien ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:
106645502



Prepared by Lien Solutions, P.O. Box 29071, Glendale, CA 91209-9071 Tel (800) 331-3282

# UCC FINANCING STATEMENT ADDENDUM

FOLLOW INSTRUCTIONS

9. NAME OF FIRST DEBTOR: Same as line 1a or 1b on Financing Statement; if line 1b was left blank because Individual Debtor name did not fit, check here ☐

9a. ORGANIZATION'S NAME: Innercity Collaborative Community Development Corp

OR 9b. INDIVIDUAL'S SURNAME:

FIRST PERSONAL NAME:

ADDITIONAL NAME(S)/INITIAL(S): | SUFFIX:

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

10. DEBTOR'S NAME: Provide (10a or 10b) only one additional Debtor name or Debtor name that did not fit in line 1b or 2b of the Financing Statement (Form UCC1) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name) and enter the mailing address in line 10c

10a. ORGANIZATION'S NAME: Innercity Collaborative Community Development Corporation

OR 10b. INDIVIDUAL'S SURNAME:

INDIVIDUAL'S FIRST PERSONAL NAME:

INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S): | SUFFIX:

| 10c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 5219 Call Pl SE | Washington DC | DC | 20019 | USA |

11. ☐ ADDITIONAL SECURED PARTY'S NAME or ☐ ASSIGNOR SECURED PARTY'S NAME: Provide only one name (11a or 11b)

11a. ORGANIZATION'S NAME:

OR

| 11b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

| 11c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

12. ADDITIONAL SPACE FOR ITEM 4 (Collateral):

13. ☐ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS (if applicable)

14. This FINANCING STATEMENT: ☐ covers timber to be cut ☐ covers as-extracted collateral ☐ is filed as a fixture filing

15. Name and address of a RECORD OWNER of real estate described in item 16 (if Debtor does not have a record interest):

16. Description of real estate:

17. MISCELLANEOUS: 106645502-DC-0 C T CORPORATION SYSTEM, AS File with: District of Columbia, DC



Prepared by Lien Solutions, P.O. Box 29071, Glendale, CA 91209-9071 Tel (800) 331-3282

# UCC FINANCING STATEMENT ADDITIONAL PARTY

FOLLOW INSTRUCTIONS

18. NAME OF FIRST DEBTOR: Same as line 1a or 1b on Financing Statement; if line 1b was left blank because Individual Debtor name did not fit, check here ☐

18a. ORGANIZATION'S NAME
Innercity Collaborative Community Development Corp

OR 18b. INDIVIDUAL'S SURNAME

FIRST PERSONAL NAME

ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

19. ADDITIONAL DEBTOR'S NAME: Provide only one Debtor name (19a or 19b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

19a. ORGANIZATION'S NAME
Innercity Collaborative Community Development

| OR 19b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| --- | --- | --- | --- |
| | | | |

| 19c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| --- | --- | --- | --- | --- |
| 5219 Call Pl SE | Washington DC | DC | 20019 | USA |

20. ADDITIONAL DEBTOR'S NAME: Provide only one Debtor name (20a or 20b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

20a. ORGANIZATION'S NAME

| OR 20b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| --- | --- | --- | --- |
| | | | |

| 20c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| --- | --- | --- | --- | --- |
| | | | | |

21. ADDITIONAL DEBTOR'S NAME: Provide only one Debtor name (21a or 21b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

21a. ORGANIZATION'S NAME

| OR 21b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| --- | --- | --- | --- |
| | | | |

| 21c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| --- | --- | --- | --- | --- |
| | | | | |

22. ☐ ADDITIONAL SECURED PARTY'S NAME or ☐ ASSIGNOR SECURED PARTY'S NAME: Provide only one name (22a or 22b)

22a. ORGANIZATION'S NAME

| OR 22b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| --- | --- | --- | --- |
| | | | |

| 22c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| --- | --- | --- | --- | --- |
| | | | | |

23. ☐ ADDITIONAL SECURED PARTY'S NAME or ☐ ASSIGNOR SECURED PARTY'S NAME: Provide only one name (23a or 23b)

23a. ORGANIZATION'S NAME

| OR 23b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| --- | --- | --- | --- |
| | | | |

| 23c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| --- | --- | --- | --- | --- |
| | | | | |

24. MISCELLANEOUS: 106645502-DC-0 C T CORPORATION SYSTEM, AS File with: District of Columbia, DC



Prepared by Lien Solutions, P.O. Box 29071, Glendale, CA 91209-9071 Tel (800) 331-3282

Doc #: 2025112987
Filed & Recorded
11/19/2025 12:36 PM
DANIEL ALTOMARE
DEPUTY RECORDER OF DEEDS
WASH DC RECORDER OF DEEDS

| | |
|---|---|
| RECORDING FEES | $25.00 |
| SURCHARGE | $5.00 |
| TOTAL: | $30.00 |

PEARL CAPITAL

## Sale of Future Receipts Agreement

| Seller's Legal Name | D/B/A | Primary State of Business | Form of Business Entity and State of Incorporation |
|---|---|---|---|
| Innercity Collaborative Community Development Corp / Innercity Collaborative Community Development Co / Innercity Collaborative Community Development Corporation | Innercity Collaborative Community Development | DC | DC |

| Primary Contact Name | Primary Contact Title | Email | Primary Contact Phone Number |
|---|---|---|---|
| JUDY SHEPHERD-MARTIN | Owner | [redacted] | [redacted] |

**Seller's Bank Account**

[redacted] [redacted] [redacted] [redacted] [redacted]

| Purchase Price Paid to Seller<br>$139,860.00 | Initial Periodic Amount<br>$5,000.00 |
|---|---|
| Purchased Amount of Future Receipts<br>$200,000.00 | **What is the Initial Periodic Amount?** |
| Specified Percentage<br>8.67% | The Initial Periodic Amount is an estimate of the Specified Percentage of your average sales revenue. We will debit the Periodic Amount from your Bank Account Weekly once per week on Friday or the next business day if that day is a holiday, subject to your actual revenue. We based the Initial Periodic Amount on information you provided or made available to us to calculate your average revenue over a period of time prior to the date of this Agreement. Please refer to Section 4 of this Agreement for how you can adjust the Periodic Amount. |
| Periodic Frequency<br>Weekly once per week on Friday or the next business day if that day is a holiday | |

| | | | |
|---|---|---|---|
| **Itemization Of Net Amount Funded To Seller** | **Purchase Price** | $139,860.00 | |
| | Prior Balance(s) | - $0.00 | (If applicable) paid to Buyer and/or third parties and subject to adjustment for cleared payments. |
| | Origination Fee | - $4,196.00 | |
| | **Net Amount Funded to Seller** | $135,664.00 | |

This Sale of Future Receipts Agreement ("Agreement") effective, 7/29/2025, is made by and between Pearl Alpha Funding, LLC ("Buyer"), the business identified above ("Seller"), and each Guarantor identified below (each a "Guarantor").

Seller, hereby sells and assigns to Buyer, without recourse, the Purchased Amount of the proceeds of each future sale made by Seller (collectively "Future Receipts") and will deliver the Specified Percentage of Future Receipts in accordance with this Agreement.

**Agreement of Seller:** By signing below Seller agrees to the terms and conditions contained in this Agreement, including those terms and conditions on the following pages, and further agrees that this transaction is for business purposes.

Seller: Innercity Collaborative Community Development Corp / Innercity Collaborative Community Development Co / Innercity Collaborative Community Development Corporation

Agree to by: JUDY SHEPHERD-MARTIN DocuSigned by: Judy Shepherd-Martin C08D71A7532D473... , its Authorized Officer (Title)

Agree to by: ______________________ , its Authorized Officer (Title)

**Agreement of Each Guarantor:** By signing below each Guarantor agrees to the terms and conditions contained in this Agreement, including those terms and conditions on the following pages, and further agrees that this transaction is for business purposes.

Notice: This agreement contains a personal guaranty of performance, and by signing below, you and each of the additional guarantors listed below agree that you will be personally liable for the prompt and complete performance of certain obligations of Seller as described in this Agreement.

Name: JUDY SHEPHERD-MARTIN, individually and (to the extent applicable) as an authorized officer of each of the additional guarantors listed below DocuSigned by: Judy Shepherd-Martin C08D71A7532D473...

Name: ______________________

Name: ______________________ Name: ______________________

Additional Guarantors: JUDY SHEPHERD-MARTIN and JUDIE SHEPHERD-GORE and JUDIE SHEPHERD-MARTIN

## Terms and Conditions

1. **Future Receipts.** "Future Receipts" means all payments received by Seller, or its right to receive such payments, in the ordinary course of Seller's business, including but not limited to (a) payments made by cash, check, Automate Clearing House ("ACH") or other electronic transfer, (b) payments, or right of payments, made by credit card, debit card, bank card, charge card (each such card shall be referred to herein as a "Payment Card"); (c) accounts and payment intangibles; and (d) payments made by any other form. As payment for the Purchased Amount, Buyer will pay to Seller the Purchase Price, minus any fees and amounts to satisfy prior balances shown above.

2. **Buyer's Acceptance of Agreement.** The obligation of Buyer under this Agreement will not be effective unless and until Buyer has completed its review of the Seller and has accepted this Agreement by delivering the Net Amount Funded to Seller, shown above. Prior to accepting this Agreement, Buyer may conduct a processing trial to confirm its access to Seller's Account, shown above (the "Account") and the ability to withdraw the Initial Periodic Amount. If the processing trial is not completed to the satisfaction of Buyer, Buyer will refund to Seller all funds that were obtained by Buyer during the processing trial.

3. **Delivery of Purchased Amount.** Seller authorizes Buyer to debit the Initial Periodic Amount or any updated periodic amount (the "Periodic Amount") from the Account each business day by either ACH or electronic check. Seller will provide Buyer with all required Account information and agrees not to change the information without prior written consent from Buyer. Seller will provide an appropriate ACH authorization to Buyer. If any draft or electronic debit is returned for insufficient funds, then Seller will be responsible for any fees incurred by Buyer resulting from a rejected electronic check or ACH debit attempt, as set forth on Appendix A. Buyer is not responsible for any overdrafts or rejected transactions that may result from Buyer's debiting any amount authorized under the terms of this Agreement. Seller understands that the foregoing ACH authorization is a fundamental condition to induce Buyer to accept the Agreement. Consequently, such authorization is intended to be irrevocable during the course of this Agreement.

   In the event that Seller changes or permits changes to the Account or the ACH authorization approved by the Buyer or adds an additional bank account, Buyer shall have the right, without waiving any of its rights and remedies and without notice to Seller or any Guarantor, to notify the new or additional bank of this Agreement and to direct such new or additional bank to remit to the Buyer all or any portion of the amounts received by such bank. Any such new account shall be deemed an Account.

4. **Reconciliation and Adjusting the Periodic Amount (IMPORTANT PROTECTION FOR SELLER).** The initial Periodic Amount is intended to represent the Specified Percentage of Seller's Future Receipts. At any time, Seller or Buyer has the right to require a reconciliation of Seller's actual revenue to adjust the Periodic Amount to more closely reflect the Seller's actual Future Receipts times the Specified Percentage.

   a. **How Seller may Request a Reconciliation.** Seller may request a reconciliation by sending an e-mail to trueup@pearlcash.com.

   b. **How Buyer may Request a Reconciliation.** Buyer may request a reconciliation in writing via regular mail or e-mail.

   c. **Reconciliation Information.** Seller shall provide Buyer with a copy of Seller's most recent month's official Account statement (the "Reconciliation Information"). Upon receipt of the Reconciliation Information, Buyer shall promptly recalculate Seller's average revenue. If necessary to verify the Reconciliation Information, Buyer may request view-only access to the Account.

   d. **Adjusting the Periodic Amount.** Within three (3) business days of Buyer's reasonable verification of the Reconciliation Information, Buyer shall adjust the Periodic Amount on a going-forward basis to more closely reflect Seller's actual Receipts times the Specified Percentage. Buyer will notify Seller prior to any such adjustment. After each adjustment made pursuant to this paragraph, the new dollar amount will be deemed the updated Periodic Amount until any subsequent adjustment.

   e. **Failure to Provide Reconciliation Information.** If Seller requests a reconciliation and fails to provide the Reconciliation Information within ten (10) calendar days after Seller's reconciliation request, Buyer may consider Seller's reconciliation request withdrawn. If Buyer requests a reconciliation and Seller fails to provide the Reconciliation Information within ten (10) calendar days after Buyer's reconciliation request, Buyer may adjust the Periodic Amount based on the best information reasonably available to Buyer.

5. **Nonrecourse Sale of Future Receipts (THIS IS NOT A LOAN).** Seller is selling a portion of a future revenue stream to Buyer at a discount, not borrowing money from Buyer. There is no interest rate or payment schedule and no time period during which the Purchased Amount must be collected by Buyer. Seller acknowledges that it has no right to repurchase the Purchased Amount from Buyer. Buyer assumes the risk that Future Receipts may be remitted more slowly than Buyer may have anticipated or projected because Seller's business has slowed down, and the risk that the full Purchased Amount may never be remitted because Seller's business goes bankrupt or Seller otherwise ceased operations in the ordinary course of business. Buyer is buying the Purchased Amount knowing the risks that Seller's business may slow down or fail, and Buyer assumes these risks based on Seller's representations, warranties and covenants in this Agreement that are designed to give Buyer a reasonable and fair opportunity to receive the benefit of its bargain. By this Agreement, Seller transfers to Buyer full and complete ownership of the Purchased Amount of Future Receipts and Seller retains no legal or equitable interest therein.

6. **Fees and Charges.** A list of all fees and charges applicable under this Agreement is contained in Appendix A. Some or all of the Origination Fee may be paid to a broker. Otherwise, Buyer is NOT CHARGING ANY BROKER FEES to Seller. If Seller is charged another such fee, Seller acknowledges that it is not being charged by Buyer.

7. **Credit Report and Other Authorizations.** Seller and each of the Guarantors signing above authorize Buyer, its agents and representatives and any credit reporting agency engaged by Buyer, to (i) investigate any references given or any other statements or data obtained from or about Seller or any of the Guarantors for the purpose of this Agreement, (ii) obtain consumer and business credit reports on the Seller and any of its Owners, and (iii) to contact personal and business references provided by the Seller in the Application, at any time now or for so long as Seller and/or Guarantors continue to have any obligations to Buyer as a consequence of this Agreement or for Buyer's ability to determine Seller's eligibility to enter into any future agreement with Buyer.

8. **Authorization to Contact Current and Prior Banks.** Seller hereby authorizes Buyer to contact any current or prior bank of the Seller in order to obtain whatever information it reasonably requires regarding Seller's compliance with this Agreement. Such information may include but is not limited to, information necessary to verify the amount of Future Receipts previously processed on behalf of Seller and any fees that may have been charged by the bank. In addition, Seller authorizes Buyer to contact any current or prior bank of the Seller for collections and in order to confirm that Seller is exclusively using the Account identified above, or any other account approved by Buyer, for the deposit of all business receipts.

9. **Right to Cancel.** Seller understands that Buyer offers Seller a right to cancel this Agreement at any time within three (3) calendar days after Buyer has delivered the Net Funded Amount to Seller. Seller may exercise this right by notifying Buyer that it is cancelling this Agreement and paying to Buyer the following amount in immediately available U.S.

funds: (a) the Net Funded Amount, and (b) any portion of the Purchase Price that was advanced to third parties. Seller's right to cancel shall be effective only if Buyer receives both the notice and the required payment no later than 5:00 PM Eastern Time on the third calendar day following the date on which Seller received the Net Funded Amount.

10. **Financial Information.** Seller authorizes Buyer and its agents to investigate its financial responsibility and history, and will provide to Buyer any authorizations, banking or financial statements, tax returns, etc., as Buyer deems necessary and reasonable prior to or at any time after execution of this Agreement. A photocopy of this authorization will be deemed acceptable as an authorization for release of financial and credit information. Buyer is authorized to update such information and financial and credit profiles from time to time as it deems appropriate. Seller waives, to the maximum extent permitted by law, any claim for damages against Buyer or any of its affiliates relating to any investigation undertaken by or on behalf of Buyer as permitted by this Agreement or disclosure of information as permitted by this Agreement.

11. **Transactional History.** Seller authorizes all of its banks and brokers and its Payment Card processor(s) to provide Buyer with Seller's banking, brokerage and/or processing history to determine qualification or continuation in this program, or for collections upon a breach of this Agreement.

12. **Application of Amounts Received by Buyer.** Buyer reserves the right to apply amounts received by it under this Agreement to any fees or other charges due to Buyer from Seller prior to applying such amounts to reduce the amount of any outstanding Purchased Amount.

13. **Changing the Remittance Frequency.** The parties may change the Remittance Frequency pursuant to this Section. The effective date of any change to the Remittance Frequency is referred to herein as the "Change Effective Date". Any change to the Remittance Frequency will be accompanied by a change to the Periodic Amount immediately following the Change Effective Date. The process for requesting changes to the Remittance Frequency and calculation of the Periodic Amount is described below.

a. Changing Remittance Frequency to occur each Business Day. Either Buyer or Seller may request that a weekly or monthly Remittance Frequency be changed to occur on each business day. The party requesting a change must notify the other party in accordance with Section 22 (Notices). The Change Effective Date shall take effect promptly, but no later than one week from the date such notice is either sent or received by Buyer. Immediately after the Change Effective Date, the new Periodic Amount shall be adjusted to an amount equal to: (a) the Periodic Amount immediately prior to the Change Effective Date, divided by five (in the case of a change from a weekly Remittance Frequency) or twenty (in the case of a change from a monthly Remittance Frequency).

b. Changing Remittance Frequency to occur weekly or monthly. When the Remittance Frequency is each business day, the Remittance Frequency may be changed to occur weekly or monthly, but only if both parties agree to such change in writing (which may be memorialized in an electronic record, including email). To be effective, both parties must agree on the changed Remittance Frequency. Immediately after the Change Effective Date, the new Periodic Amount shall be adjusted to an amount equal to: (a) the Periodic Amount immediately prior to the Change Effective Date, multiplied by five (in the case of a change to a weekly Remittance Frequency) or twenty (in the case of a change to a monthly Remittance Frequency).

c. Effect on reconciliation. Following any Change Effective Date, subsequent adjustments to the Periodic Amount pursuant to Section 4 (Reconciliation Process) shall account for the change in Remittance Frequency as described above.

14. **Representations, Warranties and Covenants of Seller.** As of the date of this Agreement and, unless expressly stated otherwise, continuing until Buyer has received 1) the Purchased Amount and 2) all fees and charges due under this Agreement, Seller represents, warrants and covenants to Buyer as follows:

a. **No Diversion of Future Receipts.** Seller must deposit all Future Receipts into the Account on a daily basis and must instruct Seller's credit card processor, which must be approved by Buyer (the "Processor") to deposit all Payment Card receipts of Seller into the Account on a daily basis. Seller agrees not to (i) change the Account, (ii) add an additional Account, (iii) revoke Buyer's authorization to debit the Account, (iv) close the Account without the express written consent of Buyer or, (v) take any other action with the intent to interfere with Buyer's right to collect the purchased Future Receipts.

b. **Stacking Prohibited.** After the date of this Agreement, Seller shall not enter into any financing agreement that relates to or encumbers its Future Receipts or requires daily payments with any party other than Buyer or Buyer's affiliates for the duration of this Agreement. Buyer may share information regarding this Agreement with any third party in order to determine whether Seller is in compliance with this provision.

c. **Accurate and Timely Financial Information.** Any bank statements and financial statements of Seller that have been furnished to Buyer, and future statements that will be furnished to Buyer, fairly and accurately represent the financial condition of Seller at such dates. Furthermore, Seller represents that all documents, forms and recorded interviews provided to or with Buyer are true, accurate and complete in all respects, and accurately reflect Seller's financial condition and results of operations at the time they are provided. Seller will provide Buyer with copies of and/or electronic access to all reasonable documentation related to Merchant's Payment Card processing activity or financial, banking, or tax affairs within ten (10) calendar days of a request by Buyer. The parties agree that reasonable documentation includes but is not limited to accounts receivable aging reports, financial statements, bank statements and other reasonable form of documentation in accordance with this Agreement. Seller further agrees to authorize the release of any past or future tax returns to Buyer

d. **Compliance with Law and Governmental Approvals.** Seller is in compliance and shall comply with all applicable federal, state and local laws, rules and regulations and has valid permits, authorizations and licenses to own, operate and lease its properties and to conduct the businesses in which it is presently engaged and/or will engage in hereafter.

e. **Authority to Enter Into This Agreement.** Seller and the person(s) signing this Agreement on behalf of Seller, have full power and authority to incur and perform the obligations under this Agreement, all of which have been duly authorized.

f. **Change of Name or Location or Sale or Closing of Business.** Seller will not conduct Seller's businesses under any name other than as disclosed to Buyer or change any of its places of business without prior written consent of Buyer. Seller will not voluntarily sell, dispose, transfer or otherwise convey all or substantially all of its business or assets without (i) the express prior written consent of Buyer, and (ii) the written agreement of any purchaser or transferee assuming all of Seller's obligations under this Agreement pursuant to documentation satisfactory to Buyer. As of the date of this Agreement, Seller does not plan to close its business either temporarily, whether for renovations, repairs or any other purpose, or permanently. Seller will not voluntarily close its business on a temporary basis for renovations, repairs, or any other voluntary purposes. This provision, however, does not prohibit Seller from closing its business temporarily if such closing is required to conduct renovations or repairs that are required by local ordinance or other legal order, such as from a health or fire inspector, or if otherwise forced to do so by circumstances outside of the control of Seller. Prior to any such closure, Seller will provide Buyer 10 calendar days' notice to the extent practicable.

g. **No Pending or Contemplated Bankruptcy as of the Date of this Agreement.** As of the date of this Agreement, (a) Seller has not filed, and does not plan to file, any petition for bankruptcy protection under Title 11 of the United States Code, (b) there has been no involuntary petition brought or pending against Seller, and (c) Seller

has not received any communication from any third party indicating that an involuntary petition will be filed against Seller. Seller represents that it has not consulted with a bankruptcy attorney or a debt relief organization within six months prior to the date of this Agreement. Seller further warrants that as of the date of this Agreement it does not plan to engage the services of a debt relief organization.

h. **Seller to Pay Taxes Promptly.** Seller will promptly pay all necessary taxes, including but not limited to employment and sales and use taxes.

i. **No Violation of Prior Agreements.** Seller's execution and performance of this Agreement does not conflict with and will not violate any other agreement, obligation, promise, court order, administrative order or decree, law or regulation to which Seller is subject, including any agreement that prohibits the sale or pledge of Seller's Future Receipts.

j. **Seller's Knowledge and Representation.** Seller represents, warrants, and agrees that it is a sophisticated business entity familiar with the kind of transaction covered by the Agreement; it was represented by counsel or had full opportunity to consult with counsel.

k. **Accurate and Complete Information.** Seller represents, warrants, and agrees that all information provided to Buyer and all statements made to Buyer relating to this transaction in any way have been truthful, accurate, and complete. Seller further agrees that Seller will be truthful in all future statements to Buyer, and will provide Buyer with accurate and complete information regarding Seller's business as required by this Agreement.

**15. Rights of Buyer.**

a. **Acknowledgment of Security Interest and Security Agreement.** The sale of Future Receipts by Seller to Buyer pursuant to this Agreement shall constitute and shall be construed and treated for all purposes as a true and complete sale, conveying good title to the Future Receipts free and clear of any undisclosed liens and encumbrances, from Seller to Buyer. To the extent the Future Receipts are "accounts" or "payment intangibles" as those terms are defined in the Uniform Commercial Code as in effect in the state in which the Seller is located ("UCC") then: (i) the sale of the Future Receipts creates a security interest as defined in the UCC, (ii) this Agreement constitutes a "security agreement" under the UCC, and (iii) Buyer has all the rights of a secured party under the UCC with respect to such Future Receipts. Seller further agrees that, with or without a breach of this Agreement, Buyer may notify account debtors, or other persons obligated on the Future Receipts, or holding the Future Receipts, of Seller's sale of the Future Receipts and may instruct them to make payment or otherwise render performance to or for the benefit of Buyer.

b. **Financing Statements.** Seller authorizes Buyer to file one or more UCC-1 forms consistent with the UCC to give notice that the Purchased Amount of Future Receipts is the sole property of Buyer. The UCC filing may state that such sale is intended to be a sale and not an assignment for security and may state that the Seller is prohibited from obtaining any financing that impairs the value of the Future Receipts or Buyer's right to collect same. Seller authorizes Buyer to debit the Account for all costs incurred by Buyer associated with the filing, amendment or termination of any UCC filings.

c. **Right of Access.** In order to ensure that Seller is complying with the terms of this Agreement, Buyer shall have the right to (i) enter during regular business hours, without notice, the premises of Seller's business for the purpose of inspecting and checking Seller's transaction processing terminals to ensure the terminals are properly programmed to submit and or batch Seller's daily receipts to the Processor and to ensure that Seller has not violated any other provision of this Agreement, (ii) Seller shall provide access to its employees and records and all other items as requested by Buyer; and (iii) have Seller provide reasonably requested information about its business operations, banking relationships, vendors, landlord and other information to allow Buyer to interview any relevant parties.

d. **Phone Recordings and Contact.** Seller agrees that any call between Buyer and Seller, and their agents and employees may be recorded or monitored. Further, Seller agrees that (i) it has an established business relationship with Buyer, its employees and agents and that Seller may be contacted from time-to-time regarding this or other business transactions, (ii) that such communications and contacts are not unsolicited or inconvenient, and (iii) that any such contact may be made at any phone number, email address, or facsimile number given to Buyer by the Seller, its agents or employees, including cellular telephones.

e. **ACH Authorization.** Seller represents and warrants that (i) the Account is solely owned by Seller; (ii) the person executing this Authorization on behalf of Seller is an authorized signer on the Account and has the power and authority to authorize Buyer to initiate ACH transactions to and from the Account, and (iii) the Account is a legitimate, open, and active bank account used solely for business purposes and not for personal, family or household purposes. Seller's bank may charge Seller fees for unsuccessful ACH entries. Seller agrees that Buyer will have no liability to Seller for such fees. In the event Buyer makes an error in processing any payment or credit, Seller authorizes Buyer to initiate ACH entries to or from the Account to correct the error. Seller acknowledges that the origination of ACH entries to and from the Account must comply with applicable law and applicable network rules. Seller agrees to be bound by the Rules and Operating Guidelines of NACHA (formerly known as the National Automated Clearing House Association). Seller will not dispute any ACH transaction initiated pursuant to this Authorization, provided the transaction corresponds to the terms of this Authorization. Seller requests the financial institution that holds the Account to honor all ACH entries initiated in accordance with this Authorization.

**16. Remedies for Seller's Breach of this Agreement.** If Seller violates any term or covenant in this Agreement, Buyer may proceed to protect and enforce its rights including, but not limited to, the following:

a. Buyer may increase the Specified Percentage to 100% and may adjust the Periodic Amount to reflect the new Specified Percentage.

b. Buyer shall have the right to collect the full undelivered Purchased Amount plus all fees and charges (including collection and legal fees as more fully described in this Agreement) assessed under this Agreement, which will become due and payable in full immediately.

c. Buyer may enforce the provisions of the Guaranty of Performance against each Guarantor.

d. Buyer may require Seller to pay Buyer all reasonable costs associated with Seller's breach. Buyer may proceed to protect and enforce its rights and remedies by arbitration or lawsuit. In any such arbitration or lawsuit, under which Buyer shall recover judgment against Seller, Seller shall be liable for all of Buyer's costs, including but not limited to all reasonable attorneys' fees and court costs. However, the rights of Buyer under this provision shall be limited as provided in the arbitration provision set forth below.

e. Buyer may debit depository accounts wherever situated by means of ACH debit or facsimile signature on a computer-generated check drawn on any of Seller's banking accounts for all sums due to Buyer.

f. Subject to the arbitration provisions of this Agreement, all rights, powers and remedies of Buyer in connection with this Agreement may be exercised at any time by Buyer after the occurrence of breach, are cumulative and not exclusive, and shall be in addition to any other rights, powers or remedies provided by law or equity.

17. **Modifications, Amendments.** No modification, amendment, waiver or consent of any provision of this Agreement shall be effective unless the same is in writing and signed by Buyer.

18. **Assignment.** Buyer may assign, transfer or sell its rights to receive the Purchased Amount or delegate its duties hereunder, either in whole or in part, with or without prior written notice to Seller.

19. **Guaranty of Performance.** Guarantor agrees to irrevocably, absolutely and unconditionally guarantee to Buyer prompt and complete performance of the following obligations of Seller (the "Guaranteed Obligations"):

   a. Seller's obligation to not (i) change the Account, (ii) add an additional Account, (iii) revoke Buyer's authorization to debit the Account, (iv) close the Account without the express written consent of Buyer or (v) take any other action with the intent to interfere with Buyer's right to collect the purchased Future Receipts;

   b. Seller's obligation to not conduct Seller's businesses under any name other than as disclosed to Buyer;

   c. Seller's obligation to not change any of its places of business without prior written consent by Buyer;

   d. Seller's obligation to not voluntarily sell, dispose, transfer or otherwise convey its business or substantially all business assets without (i) the express prior written consent of Buyer, and (ii) the written agreement of any purchaser or transferee assuming all of Seller's obligations under this Agreement pursuant to documentation satisfactory to Buyer;

   e. Seller's obligation, after the date of this Agreement, to not enter into any financing agreement that relates to or encumbers its Future Receipts with any party other than Buyer or Buyer's affiliates for the duration of this Agreement without Buyer's prior written consent; and

   f. Seller's obligation to provide truthful, accurate, timely, and complete information as required by this Agreement.

20. **Guarantor Waivers**. Buyer does not have to notify Guarantor of any of the following events and Guarantor will not be released from its obligations under the Agreement and this Personal Guaranty of Performance if it is not notified of: (i) Seller's failure to timely perform any obligation under the Agreement, (ii) any adverse change in Seller 's financial condition or business, (iii) Buyer's acceptance of the Agreement, and (iv) any renewal, extension or other modification of the Agreement or Seller 's other obligations to Buyer. In addition, Buyer may take any of the following actions without releasing Guarantor from any of its obligations under the Agreement and this Performance Guaranty: (i) renew, extend or otherwise modify the Agreement or Seller's other obligations to Buyer, and (ii) release Seller from its obligations to Buyer. Guarantor shall not seek reimbursement from Seller or any other guarantor for any amounts paid by it under the Agreement or this Performance Guaranty. Guarantor permanently waives and shall not seek to exercise any of the following rights that it may have against Seller, or any other guarantor, for any amounts paid by it, or acts performed by it, under the Agreement or this Performance Guaranty: (i) subrogation, (ii) reimbursement, (iii) performance, (iv) indemnification, or (v) contribution.

21. **Guarantor Acknowledgement.** Guarantor acknowledges that Guarantor understands the seriousness of the provisions of the Agreement, including the Jury Waiver, Class Action Waiver and Arbitration sections, and has had a full opportunity to consult with counsel their choice, and have consulted with counsel or have decided not to avail themselves of that opportunity.

22. **Notices.**

   a. **Notices from Buyer.** Buyer may send any notices, disclosures, terms and conditions, other documents, and any future changes to Seller by regular mail or by e-mail, at Buyer's option and Seller consents to such electronic delivery. Notices sent by e-mail are effective when sent. Notices sent by regular mail become effective three days after mailing to Seller's address set forth in this Agreement.

   b. **Notices from Seller and Guarantor.** Subject to Section 4 of this Agreement, Seller and Guarantor may send any notices to Buyer by e-mail only upon the prior written consent of Buyer, which consent may be withheld or revoked at any time in Buyer's sole discretion. Otherwise, any notices or other communications from Seller and Guarantor to Buyer must be delivered by certified mail, return receipt requested, to Buyer's at 55 Almeria Ave, 2nd Floor Coral Gables, FL 33134 address set forth in this Agreement. Notices sent to Buyer shall become effective only upon receipt by Buyer.

23. **Binding Effect, Governing Law, Venue and Jurisdiction.** This Agreement shall be binding upon and inure to the benefit of Seller, Buyer, Guarantor and their respective successors and assigns, except that Seller shall not have the right to assign its rights hereunder or any interest herein without the prior written consent of Buyer which consent may be withheld in Buyer's sole discretion. Except as set forth in the Arbitration section, this Agreement shall be governed by and construed in accordance with the laws of the state of Florida, without regard to any applicable principles of conflicts of law. Seller and Guarantor understand and agree that (i) Buyer is located in Florida, (ii) Buyer makes all decisions from Buyer's office in Florida, (iii) the Agreement is made in Florida (that is, no binding contract will be formed until Buyer receives and accepts Seller's signed Agreement in Florida), and (iv) Seller's payments are not accepted until received by Buyer in Florida. Any suit, action or proceeding arising hereunder, or the interpretation, performance or breach of this Agreement, shall, if Buyer so elects, be brought in the state and federal courts situated in Miami-Dade County, Florida, (the "Acceptable Forums"). Seller and Guarantor agree that the Acceptable Forums are convenient to it, and submit to the jurisdiction of the Acceptable Forums and waives any and all objections to jurisdiction or venue. Should such proceeding be initiated in any other forum, Seller and Guarantor waive any right to oppose any motion or application made by Buyer to transfer such proceeding to an Acceptable Forum. IN ADDITION TO THE METHODS OF SERVICE PERMITTED BY THE FLORIDA RULES OF CIVIL PROCEDURE MERCHANT AND EACH GUARANTOR HEREBY CONSENTS TO SERVICE OF PROCESS UPON IT/HIM/HER/THEM BY EMAIL TO THE EMAIL ADDRESSES AS LAST PROVIDED TO REVENUED. SERVICE HEREUNDER SHALL BE DEEMED COMPLETE UPON MAILING OR EMAILING, WHICHEVER THE CASE SHALL BE, REGARDLESS OF ACTUAL DELIVERY. MERCHANT AND EACH GUARANTOR WILL HAVE TWENTY (20) CALENDAR DAYS THEREAFTER IN WHICH TO RESPOND. IF MERCHANT AND/OR ANY GUARANTOR MOVE OR RELOCATE OR CHANGE THEIR EMAIL ADDRESS, THEY ARE HEREBY REQUIRED TO PROVIDE SUCH UPDATED ADDRESSES TO PURCHASER WITH SEVEN DAYS OF SUCH MOVE, RELOCATION OR CHANGE.

24. **Survival of Representations, Warranties and Covenants.** All representations, warranties and covenants herein shall survive the execution and delivery of this Agreement and shall continue in full force until all obligations under this Agreement shall have been satisfied in full.

25. **Interpretation.** All parties hereto have had the opportunity to review this Agreement with an attorney of their own choosing and have relied only on their own attorney's guidance and advice or have been provided sufficient opportunity to have an attorney of their choosing review the Agreement. No construction determinations shall be made against either Party hereto as drafter.

26. **Entire Agreement and Severability.** This Agreement embodies the entire agreement among Seller, Guarantor, and Buyer and supersedes all prior agreements and understandings relating to the subject matter hereof. In case any of the provisions in this Agreement is found to be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of any other provision contained herein shall not in any way be affected or impaired.

27. **Execution.** Facsimile signatures, or any other electronic means reflecting the party's signature hereto, shall be deemed acceptable for all purposes. The parties agree that if a duly authorized representative of each of the parties signs this Agreement and transmits such Agreement to the other party via facsimile or electronically transmitted portable document format, such transmission shall be treated in all manner and respects as an original signature (or counterpart thereof) and shall be considered to have the same binding legal effects as if it were the original signed version thereof delivered in person. At the request of a party hereto, each other party hereto shall re-execute original forms thereof and deliver them to all other parties. No party hereto shall raise the use of a facsimile machine or electronic transmission in portable document format to deliver a signature or the fact that any signature was transmitted or communicated through the use of facsimile machine or electronic transmission in portable document format as a defense to this Agreement and each such party forever waives any such defense. This Agreement may be signed in one or more counterparts, each of which shall constitute an original and all of which when taken together shall constitute one and the same agreement.

28. **Authorization to Contact.**

a. **Authorization to Contact by Phone.** Seller and Guarantor authorize Buyer, its affiliates, agents and independent contractors to contact Seller or Guarantor at any telephone number Seller or Guarantor provide to Buyer or from which Seller or Guarantor places a call to Buyer, or any telephone number where Buyer believes it may reach Seller or Guarantor, using any means of communication, including but not limited to calls or text messages to mobile, cellular, wireless or similar devices or calls or text messages using an automated telephone dialing system and/or artificial voices or prerecorded messages, even if Seller or Guarantor incurs charges for receiving such communications.

b. **Authorization to Contact by Other Means.** Seller and Guarantor also agree that Buyer, its affiliates, agents and independent contractors, may use any other medium not prohibited by law including, but not limited to, mail, e-mail and facsimile, to contact Seller and Guarantor. Seller and Guarantor expressly consent to conduct business by electronic means.

29. **<u>JURY WAIVER</u>. THE PARTIES WAIVE THE RIGHT TO A TRIAL BY JURY IN ANY COURT IN ANY SUIT, ACTION OR PROCEEDING ON ANY MATTER ARISING IN CONNECTION WITH OR IN ANY WAY RELATED TO THE TRANSACTIONS OF WHICH THIS AGREEMENT IS A PART OR ITS ENFORCEMENT, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW OR DEEMED BY A COURT OF LAW TO BE AGAINST PUBLIC POLICY. THE PARTIES ACKNOWLEDGE THAT EACH PARTY MAKES THIS WAIVER KNOWINGLY, WILLINGLY AND VOLUNTARILY AND WITHOUT DURESS, AND ACKNOWLEDGE THEIR RIGHT TO REVIEW THE RAMIFICATIONS OF THIS WAIVER WITH THEIR ATTORNEYS.**

30. **<u>CLASS ACTION WAIVER</u>. BUYER, SELLER, AND EACH GUARANTOR ACKNOWLEDGE AND AGREE THAT THE AMOUNT AT ISSUE IN THIS TRANSACTION AND ANY DISPUTES THAT ARISE BETWEEN THEM ARE LARGE ENOUGH TO JUSTIFY DISPUTE RESOLUTION ON AN INDIVIDUAL BASIS. EACH PARTY HERETO WAIVES ANY RIGHT TO ASSERT ANY CLAIMS AGAINST THE OTHER PARTIES AS A REPRESENTATIVE OR MEMBER IN ANY CLASS OR REPRESENTATIVE ACTION, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW OR DEEMED BY A COURT OF LAW TO BE AGAINST PUBLIC POLICY. TO THE EXTENT ANY PARTY IS PERMITTED BY LAW OR A COURT OF LAW TO PROCEED WITH A CLASS OR REPRESENTATIVE ACTION AGAINST THE OTHER, THE PARTIES AGREE THAT: (I) THE PREVAILING PARTY SHALL NOT BE ENTITLED TO RECOVER ATTORNEYS' FEES OR COSTS ASSOCIATED WITH PURSUING THE CLASS OR REPRESENTATIVE ACTION (NOT WITHSTANDING ANY OTHER PROVISION IN THIS AGREEMENT), AND (II) THE PARTY WHO INITIATES OR PARTICIPATES AS A MEMBER OF THE CLASS WILL NOT SUBMIT A CLAIM OR OTHERWISE PARTICIPATE IN ANY RECOVERY SECURED THROUGH THE CLASS OR REPRESENTATIVE ACTION.**

31. **<u>ARBITRATION</u>. IF BUYER, SELLER OR ANY GUARANTOR REQUESTS, THE OTHER PARTIES AGREE TO ARBITRATE ALL DISPUTES AND CLAIMS ARISING OUT OF OR RELATING TO THIS AGREEMENT. IF BUYER, SELLER OR ANY GUARANTOR SEEKS TO HAVE A DISPUTE SETTLED BY ARBITRATION, THAT PARTY MUST FIRST SEND TO ALL OTHER PARTIES, BY CERTIFIED MAIL, A WRITTEN NOTICE OF INTENT TO ARBITRATE. IF BUYER, SELLER OR ANY GUARANTOR DO NOT REACH AN AGREEMENT TO RESOLVE THE CLAIM WITHIN 30 DAYS AFTER THE NOTICE IS RECEIVED, BUYER, SELLER OR ANY GUARANTOR MAY COMMENCE A DOCUMENT-ONLY SUBMISSION ARBITRATION PROCEEDING WITH RESOLUTE SYSTEMS IN ACCORDANCE WITH THE RESOLUTE SYSTEMS FINANCIAL DISPUTE ARBITRATION RULES. BUYER WILL PROMPTLY REIMBURSE SELLER OR GUARANTOR FOR ANY ARBITRATION FILING FEE, HOWEVER, IN THE EVENT THAT BOTH SELLER AND GUARANTOR MUST PAY FILING FEES, BUYER WILL ONLY REIMBURSE SELLER'S ARBITRATION FILING FEE AND, EXCEPT AS PROVIDED IN THE NEXT SENTENCE, BUYER WILL PAY ALL ADMINISTRATION AND ARBITRATOR FEES. IF THE ARBITRATOR FINDS THAT EITHER THE SUBSTANCE OF THE CLAIM RAISED BY SELLER OR GUARANTOR OR THE RELIEF SOUGHT BY SELLER OR GUARANTOR IS IMPROPER OR NOT WARRANTED, AS MEASURED BY THE STANDARDS SET FORTH IN FEDERAL RULE OF PROCEDURE 11(B), THEN BUYER WILL PAY THESE FEES ONLY IF REQUIRED BY THE ARBITRATION RULES. SELLER AND GUARANTOR AGREE THAT, BY ENTERING INTO THIS AGREEMENT, THEY ARE WAIVING THE RIGHT TO TRIAL BY JURY. BUYER, SELLER OR ANY GUARANTOR MAY BRING CLAIMS AGAINST ANY OTHER PARTY ONLY IN THEIR INDIVIDUAL CAPACITY, AND NOT AS A PLAINTIFF OR CLASS MEMBER IN ANY PURPORTED CLASS OR REPRESENTATIVE PROCEEDING. FURTHER, BUYER, SELLER AND ANY GUARANTOR AGREE THAT THE ARBITRATOR MAY NOT CONSOLIDATE PROCEEDINGS FOR MORE THAN ONE PERSON'S CLAIMS, AND MAY NOT OTHERWISE PRESIDE OVER ANY FORM OF A REPRESENTATIVE OR CLASS PROCEEDING, AND THAT IF THIS SPECIFIC PROVISION DEALING WITH THE PROHIBITION ON CONSOLIDATED, CLASS OR AGGREGATED CLAIMS IS FOUND UNENFORCEABLE, THEN THE ENTIRETY OF THIS ARBITRATION CLAUSE SHALL BE NULL AND VOID. THIS AGREEMENT TO ARBITRATE IS GOVERNED BY THE FEDERAL ARBITRATION ACT AND NOT BY ANY STATE LAW REGULATING THE ARBITRATION OF DISPUTES. THIS AGREEMENT IS FINAL AND BINDING EXCEPT TO THE EXTENT THAT AN APPEAL MAY BE MADE UNDER THE FAA. ANY ARBITRATION DECISION RENDERED PURSUANT TO THIS ARBITRATION AGREEMENT MAY BE ENFORCED IN ANY COURT WITH JURISDICTION. THE TERMS "DISPUTES" AND "CLAIMS" SHALL HAVE THE BROADEST POSSIBLE MEANING.**

32. **<u>RIGHT TO OPT OUT OF ARBITRATION</u>. SELLER AND GUARANTOR(S) MAY OPT OUT OF THE ARBITRATION PROVISION ABOVE. TO OPT OUT OF THE ARBITRATION CLAUSE, SELLER AND EACH GUARANTOR MUST SEND BUYER A NOTICE THAT THE SELLER AND EACH GUARANTOR DOES NOT WANT THE CLAUSE TO APPLY TO THIS AGREEMENT. FOR ANY OPT OUT TO BE EFFECTIVE, SELLER AND EACH GUARANTOR MUST SEND AN OPT OUT NOTICE TO THE FOLLOWING EMAIL ADDRESS, WITHIN 14 DAYS AFTER THE DATE OF THIS AGREEMENT: ARBITRATION.OPTOUT@PEARLCASH.COM**

**Appendix A – List of Fees and Charges**

The Agreement provides that Seller shall be liable for the following amounts, in addition to the Purchased Amount of Future Receipts:

1. **Origination Fee as set forth on Page 1 of the Agreement.**

2. **The Wire Fee: $25.00 for a Fed Wire or $0.00 for a bank ACH**

3. **All costs Buyer incurs because Seller fails to notify Buyer in a timely manner that the Initial Periodic Amount if any subsequent Periodic Amount will not be available in the Account.**

4. **All costs incurred by Buyer associated with the filing, amendment, or termination of any UCC filings.**

5. **If Seller breaches the Agreement, all costs of collections, including attorney fees and all costs related to the enforcement of any other remedies available to Buyer.**

6. **NSF Fee (Standard): $35.00 (each)**

7. **Contract Breach Fee: lesser of $ 2,500 or 10% of the outstanding Purchased Amount to cover when Merchant (i) blocks the Account from Pearl Alpha Funding, LLC debit ACH, (ii) directs Bank to reject Pearl Alpha Funding, LLC debit ACH or (iii) changes the Account, each of which would result in a breach of the Agreement.**

**AUTHORIZATION AGREEMENT**

**FOR AUTOMATED CLEANING HOUSE TRANSACTIONS**

Innercity Collaborative Community Development ("Seller") hereby authorizes Pearl Alpha Funding, LLC ("Buyer") to present automated clearing house (ACH) debits to the following checking account in the amount of fees and other payments due to Buyer from Seller under the terms of that Sale of Future Receipts Agreement (the "Agreement") entered into between Seller and Buyer, as it may be amended, supplemented or replaced from time to time. Seller also authorizes Buyer to initiate additional entries (debits and credits) to correct any erroneous transfers. In addition, if Seller breaches the Agreement, Seller authorizes Buyer to debit any and all accounts controlled by Seller or controlled by any entity with the same Federal Tax Identification Number as Seller up to the total amount, including but not limited to, all fees and charges, due to Buyer from Seller under the terms of the Agreement.

Seller agrees to be bound by the Rules and Operating Guidelines of NACHA and represents and warrants that the designated account is established and used primarily for commercial/business purposes, and not for consumer, family or household purposes. Seller authorizes Buyer to contact Seller's financial institution to obtain available funds information and/or to verify any information Seller has provided about the designated checking account and to correct any missing, erroneous or out-of-date information. Seller understands and agrees that any revocation or attempted revocation of this Authorization will constitute a breach of the Agreement for the Sale of Future Receipts. In the event that Seller closes the designated checking account, or the designated checking account has insufficient funds for any ACH transaction under this Authorization, Seller authorizes Buyer to contact Seller's financial institution and obtain information (including account number, routing number and available balance) concerning any other deposit account(s) maintained by Seller with Seller's financial institution, and to initiate ACH transactions under this Authorization to such additional account(s). To the extent necessary, Seller grants Buyer a limited Power of Attorney to take action in Seller's name to facilitate this authorization.

Transfer Funds To/From:

Name of Bank: [redacted]

ABA Transit/Routing #: [redacted]

Checking Account #: 0[redacted]

This authorization is to remain in full force and effect until Buyer has received all amounts due or that may become due to Buyer under the Agreement.

Seller Information:

Seller's Name: Innercity Collaborative Community Development Corp / Innercity Collaborative Community Development Co / Innercity Collaborative Community Development Corporation

Signature of Authorized Representatives: DocuSigned by: Judy Shepherd-Martin C08D71A7532D473...

Print Name: JUDY SHEPHERD-MARTIN

Title:

Seller's Tax ID: [redacted]

Date: July 29, 2025

## [Attached Voided Check Here]

# Form W-9 — Request for Taxpayer Identification Number and Certification

(Rev. March 2024)
Department of the Treasury
Internal Revenue Service

Go to *www.irs.gov/FormW9* for instructions and the latest information.

**Give form to the requester. Do not send to the IRS.**

**Before you begin.** For guidance related to the purpose of Form W-9, see *Purpose of Form*, below.

Print or type. See *Specific Instructions* on page 3.

1 Name of entity/individual. An entry is required. (For a sole proprietor or disregarded entity, enter the owner's name on line 1, and enter the business/disregarded entity's name on line 2.)

**Pearl Alpha Funding LLC**

2 Business name/disregarded entity name, if different from above.

3a Check the appropriate box for federal tax classification of the entity/individual whose name is entered on line 1. Check only **one** of the following seven boxes.

☐ Individual/sole proprietor ☐ C corporation ☐ S corporation ☐ Partnership ☐ Trust/estate

☑ LLC. Enter the tax classification (C = C corporation, S = S corporation, P = Partnership) . . . . **P**

**Note:** Check the "LLC" box above and, in the entry space, enter the appropriate code (C, S, or P) for the tax classification of the LLC, unless it is a disregarded entity. A disregarded entity should instead check the appropriate box for the tax classification of its owner.

☐ Other (see instructions)

3b If on line 3a you checked "Partnership" or "Trust/estate," or checked "LLC" and entered "P" as its tax classification, and you are providing this form to a partnership, trust, or estate in which you have an ownership interest, check this box if you have any foreign partners, owners, or beneficiaries. See instructions . . . . . . . . . . ☐

4 Exemptions (codes apply only to certain entities, not individuals; see instructions on page 3):

Exempt payee code (if any)

Exemption from Foreign Account Tax Compliance Act (FATCA) reporting code (if any)

*(Applies to accounts maintained outside the United States.)*

5 Address (number, street, and apt. or suite no.). See instructions.

**55 Almeria Ave 2nd Floor**

Requester's name and address (optional)

6 City, state, and ZIP code

**Coral Gables, FL 33134**

7 List account number(s) here (optional)

## Part I Taxpayer Identification Number (TIN)

Enter your TIN in the appropriate box. The TIN provided must match the name given on line 1 to avoid backup withholding. For individuals, this is generally your social security number (SSN). However, for a resident alien, sole proprietor, or disregarded entity, see the instructions for Part I, later. For other entities, it is your employer identification number (EIN). If you do not have a number, see *How to get a TIN*, later.

**Note:** If the account is in more than one name, see the instructions for line 1. See also *What Name and Number To Give the Requester* for guidelines on whose number to enter.

Social security number: ☐☐☐ – ☐☐ – ☐☐☐☐

or

Employer identification number: [redacted]

## Part II Certification

Under penalties of perjury, I certify that:

1. The number shown on this form is my correct taxpayer identification number (or I am waiting for a number to be issued to me); and
2. I am not subject to backup withholding because (a) I am exempt from backup withholding, or (b) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest or dividends, or (c) the IRS has notified me that I am no longer subject to backup withholding; and
3. I am a U.S. citizen or other U.S. person (defined below); and
4. The FATCA code(s) entered on this form (if any) indicating that I am exempt from FATCA reporting is correct.

**Certification instructions.** You must cross out item 2 above if you have been notified by the IRS that you are currently subject to backup withholding because you have failed to report all interest and dividends on your tax return. For real estate transactions, item 2 does not apply. For mortgage interest paid, acquisition or abandonment of secured property, cancellation of debt, contributions to an individual retirement arrangement (IRA), and, generally, payments other than interest and dividends, you are not required to sign the certification, but you must provide your correct TIN. See the instructions for Part II, later.

**Sign Here** — **Signature of U.S. person** Signed by: B4E9EC80E27B4DB... Date 4/25/2025

## General Instructions

Section references are to the Internal Revenue Code unless otherwise noted.

**Future developments.** For the latest information about developments related to Form W-9 and its instructions, such as legislation enacted after they were published, go to *www.irs.gov/FormW9*.

## What's New

Line 3a has been modified to clarify how a disregarded entity completes this line. An LLC that is a disregarded entity should check the appropriate box for the tax classification of its owner. Otherwise, it should check the "LLC" box and enter its appropriate tax classification.

New line 3b has been added to this form. A flow-through entity is required to complete this line to indicate that it has direct or indirect foreign partners, owners, or beneficiaries when it provides the Form W-9 to another flow-through entity in which it has an ownership interest. This change is intended to provide a flow-through entity with information regarding the status of its indirect foreign partners, owners, or beneficiaries, so that it can satisfy any applicable reporting requirements. For example, a partnership that has any indirect foreign partners may be required to complete Schedules K-2 and K-3. See the Partnership Instructions for Schedules K-2 and K-3 (Form 1065).

## Purpose of Form

An individual or entity (Form W-9 requester) who is required to file an information return with the IRS is giving you this form because they

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

**DISTRICT OF COLUMBIA**
c/o Mayor Muriel Bowser
1350 Pennsylvania Ave. NW
Washington, DC 20004

c/o Attorney General Brian Schwalb
400 6th St. NW
Washington, DC 20001

*Plaintiff-in-Interpleader*,

v.

**INNERCITY COLLABORATIVE COMMUNITY DEVELOPMENT CORPORATION**
5219 Call Place SE
Washington, DC 20019

*and*

**PEARL ALPHA FUNDING, LLC d/b/a PEARL CAPITAL**
55 Almeria Avenue
2nd Floor
Coral Gables, FL 33134

*and*

**INTERNAL REVENUE SERVICE**
1111 Constitution Avenue, NW
Washington, DC 20224

*Claimant-Defendants.*

Civil Action No. 1:26-cv-4153

**EXHIBIT 4**

**Notice of Federal Tax Lien**

5960

**Form 668 (Y)(c)**
(Rev. February 2004)

Department of the Treasury - Internal Revenue Service

# Notice of Federal Tax Lien

Area:
SMALL BUSINESS/SELF EMPLOYED AREA #2
Lien Unit Phone: (800) 913-6050

Serial Number
541946626

For ( ordir

2026056366-1
Doc #: 2026056366 Fees: $30.00
06/09/2026 09:58 AM Pages: 1
Filed and Recorded in Official Records of
WASH DC ACTING RECORDER OF DEEDS DANIEL ALTOMA

RECORDING FEES $25.00
SURCHARGE $5.00

**As provided by section 6321, 6322, and 6323 of the Internal Revenue Code, we are giving a notice that taxes (including interest and penalties) have been assessed against the following-named taxpayer. We have made a demand for payment of this liability, but it remains unpaid. Therefore, there is a lien in favor of the United States on all property and rights to property belonging to this taxpayer for the amount of these taxes, and additional penalties, interest, and costs that may accrue.**

Name of Taxpayer INNERCITY COLLABORATIVE COMMUNITY
a Corporation

Residence 5219 CALL PL SE
WASHINGTON, DC 20019

**IMPORTANT RELEASE INFORMATION:** For each assessment listed below, unless notice of the lien is refiled by the date given in column (e), this notice shall, on the day following such date, operate as a certificate of release as defined in IRC 6325(a).

| Kind of Tax (a) | Tax Period Ending (b) | Identifying Number (c) | Date of Assessment (d) | Last Day for Refiling (e) | Unpaid Balance of Assessment (f) |
|---|---|---|---|---|---|
| 941 | 12/31/2024 | XX-XXX4156 | 04/13/2026 | 05/13/2036 | 44215.05 |
| 941 | 12/31/2025 | XX-XXX4156 | 02/09/2026 | 03/10/2036 | 667.85 |
| 941 | 03/31/2026 | XX-XXX4156 | 05/04/2026 | 06/03/2036 | 1371.26 |

Place of Filing
OFFICE OF RECORDER OF DEEDS FOR
WASHINGTON D.C.
WASHINGTON, DC 20001

Total $ 46254.16

This notice was prepared and signed at BALTIMORE, MD, on this,

the 27th day of May, 2026.

Signature Edwin Dean Curry
for A KEISER

Title
REVENUE OFFICER 22-12-1715
(202) 317-8639

(NOTE: Certificate of officer authorized by law to take acknowledgment is not essential to the validity of Notice of Federal Tax lien Rev. Rul. 71-466, 1971 - 2 C.B. 409)

**Part 1 - Kept By Recording Office**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

**DISTRICT OF COLUMBIA**
c/o Mayor Muriel Bowser
1350 Pennsylvania Ave. NW
Washington, DC 20004

c/o Attorney General Brian Schwalb
400 6th St. NW
Washington, DC 20001

*Plaintiff-in-Interpleader*,

v.

**INNERCITY COLLABORATIVE COMMUNITY DEVELOPMENT CORPORATION**
5219 Call Place SE
Washington, DC 20019

*and*

**PEARL ALPHA FUNDING, LLC d/b/a PEARL CAPITAL**
55 Almeria Avenue
2nd Floor
Coral Gables, FL 33134

*and*

**INTERNAL REVENUE SERVICE**
1111 Constitution Avenue, NW
Washington, DC 20224

*Claimant-Defendants.*

Civil Action No. 1:26-cv-4153

**EXHIBIT 5**

**Notice of Levy**

**Department of Treasury**
**Internal Revenue Service**
A KEISER
1111 CONSTITUTION AVE NW K-5100
WASHINGTON, DC 20224-0000

000254.692475.498161.27962 2 MB 0.707 1019

GOVERNMENT OF THE DISTRICT OF COLUM
1100 4TH STREET SW 8TH FLOOR EAST
WASHINGTON, DC 20024-0000

000254

Return this levy with the enclosed cover sheet in the envelope provided so our address appears in the window.

FOLD HERE and return with your reply

FOLD HERE and return with your reply

Integrated Collection System

**Internal Revenue Service**
A KEISER
1111 CONSTITUTION AVE NW
K-5100
WASHINGTON, DC 20224-0000

Form **668-A** (September 2022)

Department of the Treasury - Internal Revenue Service

# Notice of Levy

Date
07/20/2026

Telephone number of IRS office
(202) 317-8639

Reply To: **Internal Revenue Service**
A KEISER
1111 CONSTITUTION AVE NW
K-5100
WASHINGTON, DC 20224-0000

Name and address of taxpayer
INNERCITY COLLABORATIVE COMMUNITY
5219 CALL PL SE
WASHINGTON, DC 20019-0000000

To
GOVERNMENT OF THE DISTRICT OF COLUM
1100 4TH STREET SW 8TH FLOOR EAST
WASHINGTON, DC 20024-0000

Identifying number(s):
[redacted]

00254

Special instructions for certain property levied

**This isn't a bill for taxes you owe. This is a notice of levy we are using to collect money owed by the taxpayer named above.**

| Kind of Tax | Tax Period Ended | Unpaid Balance of Assessment | Statutory Additions | Total |
|---|---|---|---|---|
| 941 | 202412 | $44215.05 | $0.00 | $44215.05 |
| 941 | 202512 | $730.85 | $23.66 | $754.51 |
| | | | **Total Amount Due** | $44,969.56 |

We figured the interest and late payment penalty to: 08/18/2026

The Internal Revenue Code provides that there is a lien for the amount that is owed. Although we have given the notice and demand required by the Code, the amount owed hasn't been paid. This levy requires you to turn over to us this person's property and rights to property (such as money, credits, and bank deposits) that you have or which you are already obligated to pay this person. However, don't send us more than the "Total Amount Due."

**Money in banks, credit unions, savings and loans, and similar institutions described in section 408(n) of the Internal Revenue Code must be held for 21 calendar days from the day you receive this levy before you send us the money. Include any interest the person earns during the 21 days. Turn over any other money, property, credits, etc. that you have or are already obligated to pay the taxpayer, when you would have paid it if this person asked for payment. This levy does not attach to funds in IRAs, Self-Employed Individuals' Retirement Plans, or any other retirement plans in your possession or control.**

Make a reasonable effort to identify all property and rights to property belonging to this person. At a minimum, search your records using the taxpayer's name, address, and identifying numbers(s) shown on this form. Don't offset money this person owes you without contacting us at the telephone number shown above for instructions. You may not subtract a processing fee from the amount you send us.

**To respond to this levy —**

1. Make your check or money order payable to **United States Treasury**.
2. Write the taxpayer's name, identifying number(s), kind of tax and tax period shown on this form, and "LEVY PROCEEDS" on your check or money order (not on a detachable stub.)
3. Complete the back of Part 3 of this form and mail it to us with your payment in the enclosed envelope.
4. Keep Part 1 of this form for your records and give the taxpayer Part 2 within 2 days.

If you don't owe any money to the taxpayer, please complete the back of Part 3, and mail that part back to us in the enclosed envelope

Signature of Service Representative
A KEISER

Title
REVENUE OFFICER

## Excerpts from the Internal Revenue Code

**Sec. 6331. LEVY AND DISTRAINT.**

(b) **Seizure and Sale of Property.**–The term "levy" as used in this title includes the power of distraint and seizure by any means. Except as otherwise provided in subsection (e), a levy shall extend only to property possessed and obligations existing at the time thereof. In any case in which the Secretary may levy upon property or rights to property, he may seize and sell such property or rights to property (whether real or personal, tangible or intangible).

(c) **Successive Seizures.**–Whenever any property or right to property upon which levy has been made by virtue of subsection (a) is not sufficient to satisfy the claim of the United States for which levy is made, the Secretary may, thereafter, and as often as may be necessary, proceed to levy in like manner upon any other property liable to levy of the person against whom such claim exists, until the amount due from him, together with all expenses, is fully paid.

**Sec. 6332. SURRENDER OF PROPERTY SUBJECT TO LEVY.**

(a) Requirement.–Except as otherwise provided in this section, any person in possession of (or obligated with respect to) property or rights to property subject to levy upon which a levy has been made shall, upon demand of the Secretary, surrender such property or rights (or discharge such obligation) to the Secretary, except such part of the property or rights as is, at the time of such demand, subject to an attachment or execution under any judicial process.

(b) Special rule for Life Insurance and Endowment Contracts

(1) In general.–A levy on an organization with respect to a life insurance or endowment contract issued by such organization shall, without necessity for the surrender of the contract document, constitute a demand by the Secretary for payment of the amount described in paragraph (2) and the exercise of the right of the person against whom the tax is assessed to the advance of such amount. Such organization shall pay over such amount 90 days after service of notice of levy. Such notice shall include a certification by the Secretary that a copy of such notice has been mailed to the person against whom the tax is assessed at his last known address.

(2) Satisfaction of levy.–Such levy shall be deemed to be satisfied if such organization pays over to the Secretary the amount which the person against whom the tax is assessed could have had advanced to him by such organization on the date prescribed in paragraph (1) for the satisfaction of such levy, increased by the amount of any advance (including contractual interest thereon) made to such person on or after the date such organization had actual notice or knowledge (within the meaning of section 6323 (i)(1)) of the existence of the lien with respect to which such levy is made, other than an advance (including contractual interest thereon) made automatically to maintain such contract in force under an agreement entered into before such organization had such notice or knowledge.

(3) Enforcement proceedings.–The satisfaction of a levy under paragraph (2) shall be without prejudice to any civil action for the enforcement of any lien imposed by this title with respect to such contract.

(c) Special Rule for Banks.–Any bank (as defined in section 408(n)) shall surrender (subject to an attachment or execution under judicial process) any deposits (including interest thereon) in such bank only after 21 days after service of levy.

(d) Enforcement of Levy.

(1) Extent of personal liability.–Any person who fails or refuses to surrender any property or rights to property, subject to levy, upon demand by the Secretary, shall be liable in his own person and estate to the United States in a sum equal to the value of the property or rights not so surrendered, but not exceeding the amount of taxes for the collection of which such levy has been made, together with costs and interest on such sum at the underpayment rate established under section 6621 from the date of such levy (or, in the case of a levy described in section 6331 (d)(3), from the date such person would otherwise have been obligated to pay over such amounts to the taxpayer). Any amount (other than costs) recovered under this paragraph shall be credited against the tax liability for the collection of which such levy was made.

(2) Penalty for violation.–In addition to the personal liability imposed by paragraph (1), if any person required to surrender property or rights to property fails or refuses to surrender such property or rights to property without reasonable cause, such person shall be liable for a penalty equal to 50 percent of the amount recoverable under paragraph (1). No part of such penalty shall be credited against the tax liability for the collection of which such levy was made.

(e) Effect of honoring levy.–Any person in possession of (or obligated with respect to) property or rights to property subject to levy upon which a levy has been made who, upon demand by the Secretary, surrenders such property or rights to property (or discharges such obligation) to the Secretary (or who pays a liability under subsection (d)(1)), shall be discharged from any obligation or liability to the delinquent taxpayer and any other person with respect to such property or rights to property arising from such surrender or payment.

**Sec. 6333. PRODUCTION OF BOOKS.**

If a levy has been made or is about to be made on any property, or right to property, any person having custody or control of any books or records, containing evidence or statements relating to the property or right to property subject to levy, shall, upon demand of the Secretary, exhibit such books or records to the Secretary.

**Sec. 6343. AUTHORITY TO RELEASE LEVY AND RETURN PROPERTY**

(a) Release of Levy and Notice of Release.–

(1) In general.–Under regulations prescribed by the Secretary, the Secretary shall release the levy upon all, or part of, the property or rights to property levied upon and shall promptly notify the person upon whom such levy was made (if any) that such levy has been released if–

(A) the liability for which such levy was made is satisfied or becomes unenforceable by reason of lapse of time,

(B) release of such levy will facilitate the collection of such liability,

(C) the taxpayer has entered into an agreement under section 6159 to satisfy such liability by means of installment payments, unless such agreement provides otherwise,

(D) the Secretary has determined that such levy is creating an economic hardship due to the financial condition of the taxpayer, or

(E) the fair market value of the property exceeds such liability and release of the levy on a part of such property could be made without hindering the collection of such liability.

For purposes of subparagraph (C), the Secretary is not required to release such levy if such release would jeopardize the secured creditor status of the Secretary.

(2) Expedited determination on certain business property.–In the case of any tangible personal property essential in carrying on the trade or business of the taxpayer, the Secretary shall provide for an expedited determination under paragraph (1) if levy on such tangible personal property would prevent the taxpayer from carrying on such trade or business.

(3) Subsequent levy.–The release of levy on any property under paragraph (1) shall not prevent any subsequent levy on such property.

(b) Return of Property.–If the Secretary determines that property has been wrongfully levied upon, it shall be lawful for the Secretary to return-

(1) the specific property levied upon,

(2) an amount of money equal to the amount of money levied upon, or

(3) an amount of money equal to the amount of money received by the United States from a sale of such property.

Property may be returned at any time. An amount equal to the amount of money levied upon or received from such sale may be returned at any time before the expiration of 9 months from the date of such levy. For purposes of paragraph (3), if property is declared purchased by the United States at a sale pursuant to section 6335(e) (relating to manner and conditions of sale), the United States shall be treated as having received an amount of money equal to the minimum price determined pursuant to such section or (if larger) the amount received by the United States from the resale of such property.

(d) Return of Property in Certain Cases.— If—

(1) any property has been levied upon, and

(2) the Secretary determines that—

(A) the levy on such property was premature or otherwise not in accordance with administrative procedures of the Secretary,

(B) the taxpayer has entered into an agreement under section 6159 to satisfy the tax liability for which the levy was imposed by means of installment payments, unless such agreement provides otherwise,

(C) the return of such property will facilitate the collection of the tax liability, or

(D) with the consent of the taxpayer or the National Taxpayer Advocate, the return of such property would be in the best interests of the taxpayer (as determined by the National Taxpayer Advocate) and the United States, the provisions of subsection (b) shall apply in the same manner as if such property had been wrongly levied upon, except that no interest shall be allowed under subsection (c).

* * * * * * * * * * *

**Applicable Sections of Internal Revenue Code**

6321. LIEN FOR TAXES.
6322. PERIOD OF LIEN.
6325. RELEASE OF LIEN OR DISCHARGE OF PROPERTY.
6331. LEVY AND DISTRAINT.
6332. SURRENDER OF PROPERTY SUBJECT TO LEVY.
6333. PRODUCTION OF BOOKS.
6334. PROPERTY EXEMPT FROM LEVY.
6343. AUTHORITY TO RELEASE LEVY AND RETURN PROPERTY.
7426. CIVIL ACTIONS BY PERSONS OTHER THAN TAXPAYERS.
7429. REVIEW OF JEOPARDY LEVY OR ASSESSMENT PROCEDURES.

For more information about this notice, please call the phone number on the front of this form.

**Useful Item You may want to see:** Publication 4528, Making an Administrative Wrongful Levy Claim Under Internal Revenue Code (IRC) Section 643(b)

Form **668-A** (September 2022)

Department of the Treasury - Internal Revenue Service

# Notice of Levy

Date
07/20/2026

Telephone number of IRS office
(202) 317-8639

Reply To: **Internal Revenue Service**
A KEISER
1111 CONSTITUTION AVE NW
K-5100
WASHINGTON, DC 20224-0000

Name and address of taxpayer
INNERCITY COLLABORATIVE COMMUNITY
5219 CALL PL SE
WASHINGTON, DC 20019-0000000

To
GOVERNMENT OF THE DISTRICT OF COLUM
1100 4TH STREET SW 8TH FLOOR EAST
WASHINGTON, DC 20024-0000

000254

Identifying number(s):
[redacted]

Special instructions for certain property levied

**This isn't a bill for taxes you owe. This is a notice of levy we are using to collect money owed by the taxpayer named above.**

| Kind of Tax | Tax Period Ended | Unpaid Balance of Assessment | Statutory Additions | Total |
|---|---|---|---|---|
| 941 | 202412 | $44215.05 | $0.00 | $44215.05 |
| 941 | 202512 | $730.85 | $23.66 | $754.51 |
| | | | **Total Amount Due** | $44,969.56 |

We figured the interest and late payment penalty to 08/18/2026

Although we have told you to pay the amount you owe, it is still not paid. This is your copy of a notice of levy we have sent to collect this unpaid amount. We will send other levies if we don't get enough with this one.

**Banks, credit unions, savings and loans, and similar Institutions described in section 408(n) of the Internal Revenue Code must hold your money for 21 calendar days before sending it to us. They must include the interest you earn during that time. Anyone else we send a levy to must turn over your money, property, credits, etc. that they have (or are already obligated for) when they would have paid you. This levy does not attach funds in IRAs, Self-Employed Individuals' Retirement Plans, or any other retirement plans in your possession or control.**

If you decide to pay the amount you owe now, please **bring** a guaranteed payment (cash, cashier's check, certified check, or money order*) to the nearest IRS office with this form, so we can tell the person who received this levy not to send us your money. Make checks and money orders payable to **United States Treasury**. If you mail your payment instead of bringing it to us, we may not have time to stop the person who received this levy from sending us your money.

If we have erroneously levied your bank account, we may reimburse you for the fees your bank charged you for handling the levy. You must file a claim with the IRS on Form 8546 within one year after the fees are charged.

If you have any questions, or want to arrange payment before other levies are issued, please call or write us. If you write to us, please include your telephone number and the best time to call.

*Visit www.irs.gov to determine the closest IRS office that furnishes cash payment processing service. You will need to make an appointment at the IRS office in order to make a payment.

Signature of Service Representative
A KEISER /S/

Title
REVENUE OFFICER

**Sec. 6331. LEVY AND DISTRAINT.**

(b) **Seizure and Sale of Property.**–The term "levy" as used in this title includes the power of distraint and seizure by any means. Except as otherwise provided in subsection (e), a levy shall extend only to property possessed and obligations existing at the time thereof. In any case in which the Secretary may levy upon property or rights to property, he may seize and sell such property or rights to property (whether real or personal, tangible or intangible).

(c) **Successive Seizures.**–Whenever any property or right to property upon which levy has been made by virtue of subsection (a) is not sufficient to satisfy the claim of the United States for which levy is made, the Secretary may, thereafter, and as often as may be necessary, proceed to levy in like manner upon any other property liable to levy of the person against whom such claim exists, until the amount due from him, together with all expenses, is fully paid.

**Sec. 6332. SURRENDER OF PROPERTY SUBJECT TO LEVY.**

(a) Requirement.–Except as otherwise provided in this section, any person in possession of (or obligated with respect to) property or rights to property subject to levy upon which a levy has been made shall, upon demand of the Secretary, surrender such property or rights (or discharge such obligation) to the Secretary, except such part of the property or rights as is, at the time of such demand, subject to an attachment or execution under any judicial process.

(b) Special rule for Life Insurance and Endowment Contracts

(1) In general.–A levy on an organization with respect to a life insurance or endowment contract issued by such organization shall, without necessity for the surrender of the contract document, constitute a demand by the Secretary for payment of the amount described in paragraph (2) and the exercise of the right of the person against whom the tax is assessed to the advance of such amount. Such organization shall pay over such amount 90 days after service of notice of levy. Such notice shall include a certification by the Secretary that a copy of such notice has been mailed to the person against whom the tax is assessed at his last known address.

(2) Satisfaction of levy.–Such levy shall be deemed to be satisfied if such organization pays over to the Secretary the amount which the person against whom the tax is assessed could have had advanced to him by such organization on the date prescribed in paragraph (1) for the satisfaction of such levy, increased by the amount of any advance (including contractual interest thereon) made to such person on or after the date such organization had actual notice or knowledge (within the meaning of section 6323 (i)(1)) of the existence of the lien with respect to which such levy is made, other than an advance (including contractual interest thereon) made automatically to maintain such contract in force under an agreement entered into before such organization had such notice or knowledge.

(3) Enforcement proceedings.–The satisfaction of a levy under paragraph (2) shall be without prejudice to any civil action for the enforcement of any lien imposed by this title with respect to such contract.

(c) Special Rule for Banks.–Any bank (as defined in section 408(n)) shall surrender (subject to an attachment or execution under judicial process) any deposits (including interest thereon) in such bank only after 21 days after service of levy.

(d) Enforcement of Levy.

(1) Extent of personal liability.–Any person who fails or refuses to surrender any property or rights to property, subject to levy, upon demand by the Secretary, shall be liable in his own person and estate to the United States in a sum equal to the value of the property or rights not so surrendered, but not exceeding the amount of taxes for the collection of which such levy has been made, together with costs and interest on such sum at the underpayment rate established under section 6621 from the date of such levy (or, in the case of a levy described in section 6331 (d)(3), from the date such person would otherwise have been obligated to pay over such amounts to the taxpayer). Any amount (other than costs) recovered under this paragraph shall be credited against the tax liability for the collection of which such levy was made.

(2) Penalty for violation.–In addition to the personal liability imposed by paragraph (1), if any person required to surrender property or rights to property fails or refuses to surrender such property or rights to property without reasonable cause, such person shall be liable for a penalty equal to 50 percent of the amount recoverable under paragraph (1). No part of such penalty shall be credited against the tax liability for the collection of which such levy was made.

(e) Effect of honoring levy.–Any person in possession of (or obligated with respect to) property or rights to property subject to levy upon which a levy has been made who, upon demand by the Secretary, surrenders such property or rights to property (or discharges such obligation) to the Secretary (or who pays a liability under subsection (d)(1)), shall be discharged from any obligation or liability to the delinquent taxpayer and any other person with respect to such property or rights to property arising from such surrender or payment.

**Sec. 6333. PRODUCTION OF BOOKS.**

If a levy has been made or is about to be made on any property, or right to property, any person having custody or control of any books or records, containing evidence or statements relating to the property or right to property subject to levy, shall, upon demand of the Secretary, exhibit such books or records to the Secretary.

**Sec. 6343. AUTHORITY TO RELEASE LEVY AND RETURN PROPERTY**

(a) Release of Levy and Notice of Release.–

(1) In general.–Under regulations prescribed by the Secretary, the Secretary shall release the levy upon all, or part of, the property or rights to property levied upon and shall promptly notify the person upon whom such levy was made (if any) that such levy has been released if–

(A) the liability for which such levy was made is satisfied or becomes unenforceable by reason of lapse of time,

(B) release of such levy will facilitate the collection of such liability,

(C) the taxpayer has entered into an agreement under section 6159 to satisfy such liability by means of installment payments, unless such agreement provides otherwise,

(D) the Secretary has determined that such levy is creating an economic hardship due to the financial condition of the taxpayer, or

(E) the fair market value of the property exceeds such liability and release of the levy on a part of such property could be made without hindering the collection of such liability.

For purposes of subparagraph (C), the Secretary is not required to release such levy if such release would jeopardize the secured creditor status of the Secretary.

(2) Expedited determination on certain business property.–In the case of any tangible personal property essential in carrying on the trade or business of the taxpayer, the Secretary shall provide for an expedited determination under paragraph (1) if levy on such tangible personal property would prevent the taxpayer from carrying on such trade or business.

(3) Subsequent levy.–The release of levy on any property under paragraph (1) shall not prevent any subsequent levy on such property.

(b) Return of Property.–If the Secretary determines that property has been wrongfully levied upon, it shall be lawful for the Secretary to return-

(1) the specific property levied upon,

(2) an amount of money equal to the amount of money levied upon, or

(3) an amount of money equal to the amount of money received by the United States from a sale of such property.

Property may be returned at any time. An amount equal to the amount of money levied upon or received from such sale may be returned at any time before the expiration of 9 months from the date of such levy. For purposes of paragraph (3), if property is declared purchased by the United States at a sale pursuant to section 6335(e) (relating to manner and conditions of sale), the United States shall be treated as having received an amount of money equal to the minimum price determined pursuant to such section or (if larger) the amount received by the United States from the resale of such property.

(d) Return of Property in Certain Cases.— If—

(1) any property has been levied upon, and

(2) the Secretary determines that—

(A) the levy on such property was premature or otherwise not in accordance with administrative procedures of the Secretary,

(B) the taxpayer has entered into an agreement under section 6159 to satisfy the tax liability for which the levy was imposed by means of installment payments, unless such agreement provides otherwise,

(C) the return of such property will facilitate the collection of the tax liability, or

(D) with the consent of the taxpayer or the National Taxpayer Advocate, the return of such property would be in the best interests of the taxpayer (as determined by the National Taxpayer Advocate) and the United States, the provisions of subsection (b) shall apply in the same manner as if such property had been wrongly levied upon, except that no interest shall be allowed under subsection (c).

* * * * * * * * * *

**Applicable Sections of Internal Revenue Code**

6321. LIEN FOR TAXES.
6322. PERIOD OF LIEN.
6325. RELEASE OF LIEN OR DISCHARGE OF PROPERTY.
6331. LEVY AND DISTRAINT.
6332. SURRENDER OF PROPERTY SUBJECT TO LEVY.
6333. PRODUCTION OF BOOKS.
6334. PROPERTY EXEMPT FROM LEVY.
6343. AUTHORITY TO RELEASE LEVY AND RETURN PROPERTY.
7426. CIVIL ACTIONS BY PERSONS OTHER THAN TAXPAYERS.
7429. REVIEW OF JEOPARDY LEVY OR ASSESSMENT PROCEDURES.

For more information about this notice, please call the phone number on the front of this form.

**Useful Item You may want to see**: Publication 4528, Making an Administrative Wrongful Levy Claim Under Internal Revenue Code (IRC) Section 643(b)

Form **668-A** (September 2022)

Department of the Treasury - Internal Revenue Service

# Notice of Levy

Date
07/20/2026

Telephone number of IRS office
(202) 317-8639

Reply To: **Internal Revenue Service**
A KEISER
1111 CONSTITUTION AVE NW
K-5100
WASHINGTON, DC 20224-0000

Name and address of taxpayer
INNERCITY COLLABORATIVE COMMUNITY
5219 CALL PL SE
WASHINGTON, DC 20019-0000000

To
GOVERNMENT OF THE DISTRICT OF COLUM
1100 4TH STREET SW 8TH FLOOR EAST
WASHINGTON, DC 20024-0000

Identifying number(s):
[redacted]

00254

Special instructions for certain property levied

**This isn't a bill for taxes you owe. This is a notice of levy we are using to collect money owed by the taxpayer named above.**

| Kind of Tax | Tax Period Ended | Unpaid Balance of Assessment | Statutory Additions | Total |
|---|---|---|---|---|
| 941 | 202412 | $44215.05 | $0.00 | $44215.05 |
| 941 | 202512 | $730.85 | $23.66 | $754.51 |
| | | | **Total Amount Due** | $44,969.56 |

We figured the interest and late payment penalty to: 08/18/2026

The Internal Revenue Code provides that there is a lien for the amount that is owed. Although we have given the notice and demand required by the Code, the amount owed hasn't been paid. This levy requires you to turn over to us this person's property and rights to property (such as money, credits, and bank deposits) that you have or which you are already obligated to pay this person. However, don't send us more than the "Total Amount Due."

**Money in banks, credit unions, savings and loans, and similar institutions described in section 408(n) of the Internal Revenue Code must be held for 21 calendar days from the day you receive this levy before you send us the money. Include any interest the person earns during the 21 days. Turn over any other money, property, credits, etc. that you have or are already obligated to pay the taxpayer, when you would have paid it if this person asked for payment. This levy does not attach to funds in IRAs, Self-Employed Individuals' Retirement Plans, or any other retirement plans in your possession or control.**

Make a reasonable effort to identify all property and rights to property belonging to this person. At a minimum, search your records using the taxpayer's name, address, and identifying numbers(s) shown on this form. Don't offset money this person owes you without contacting us at the telephone number shown above for instructions. You may not subtract a processing fee from the amount you send us.

**To respond to this levy —**

1. Make your check or money order payable to **United States Treasury**.
2. Write the taxpayer's name, identifying number(s), kind of tax and tax period shown on this form, and "LEVY PROCEEDS" on your check or money order (not on a detachable stub.)
3. Complete the back of Part 3 of this form and mail it to us with your payment in the enclosed envelope.
4. Keep Part 1 of this form for your records and give the taxpayer Part 2 within 2 days.

If you don't owe any money to the taxpayer, please complete the back of Part 3, and mail that part back to us in the enclosed envelope

Signature of Service Representative
A KEISER **/S/**

Title
REVENUE OFFICER

Form **668-A** (September 2022)

Department of the Treasury – Internal Revenue Service

# Notice of Levy

| Taxpayer name(s) | Identifying number(s) (as shown on the front) |
| --- | --- |
| INNERCITY COLLABORATIVE COMMUNITY | [redacted] |

## Section 1 – Levy Acknowledgment

| Signature of person responding | Printed name of person responding |
| --- | --- |
| Your telephone number | Date and time this levy received |

## Section 2 – Levy Results (Check all applicable boxes.)

Check attached in the amount of $____________________

- ☐ No funds
- ☐ No accounts
- ☐ No record
- ☐ Account closed on ____________________ (date)

## Section 3 – Other Information (please complete this section only if you are NOT sending us the total amount the taxpayer owes.)

Taxpayer's latest address, if different from the one on this levy.

Taxpayer's telephone number: (_____) __________________ Next date you will owe funds to the taxpayer ________________

Name and address of taxpayer's employer, (if different from addressee)

Other information you believe may help us